UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| YVETTE YANG, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NANO NUCLEAR ENERGY INC., JAY YU and JAMES WALKER,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>Jury Trial Demanded |

Plaintiff Yvette Yang ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following upon personal knowledge as to Plaintiff, and upon information and belief as to all other matters based upon the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of documents filed by Defendant Nano Nuclear Energy, Inc. ("NNE" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"), research reports issued by securities and financial analysts, press releases issued by Defendants, media and news reports, and other publicly available information about Defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE AND SUMMARY OF THE ACTION**

1. This is a securities fraud class action on behalf of all those who purchased, or otherwise acquired, NNE securities during the period from May 8, 2024 through July 18, 2024, inclusive (the "Class Period"), who were damaged thereby (the "Class"). This action is brought on behalf of the Class for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10 b-5.

1

2. NNE's stock rose more than 600% since the Company went public on May 8, 2024 despite having no products, no revenue, no patents for its core technology. It was, however, buoyed by false claims about regulatory approvals belied by public records requests and projected timelines for commercial success that industry experts have characterized as "frankly laughable."

3. According to its SEC filings, NNE is an "early stage nuclear energy company" in the process of "developing smaller, cheaper, and safer advanced portable clean energy solutions." The Company's website claims NNE is "seeking to become a commercially focused, diversified, and vertically integrated company across four business lines: (i) cutting edge portable microreactor technology, (ii) nuclear fuel fabrication, (iii) nuclear fuel transportation, and (iv) nuclear industry consulting services."

4. In both public statements and regulatory filings, the Company repeatedly touted its progress towards obtaining the regulatory approvals necessary for commercialization and short timelines for commercial operations.

5. For example, before going public, in a statement to the trade publication Utility Dive on May 17, 2023, NNE's CEO James Walker claimed approvals for the Company's designs for a fuel fabrication plant at the Idaho National Laboratory were "pretty much complete."

6. Similarly, NNE's S-1, dated March 19, 2024, reiterated and expanded on Walker's claim, stating "the design audit for the ZEUS reactor was conducted and completed by INL in February 2024, the report of which is currently being finalized by INL." The S-1 also stated the Company had "submitted a request for information to the U.S. Department of Energy (or DOE) to initiate the approval process for the allocation of a designated site" and claimed the Company had "communicated with the U.S. Nuclear Regulatory Commission (or NRC) and DOE, informing them of the current status of our microreactor designs and the estimated internal timelines for our microreactor developments."

7. NNE's regulatory filings estimate that it will bring nuclear microreactors to market between 2030 and 2031, a timeline decades faster than those put forward by established nuclear power companies working towards the same goal.

8. On July 19, 2024, Hunterbrook Media published a report entitled "*Fission Impossible: Nano Nuclear has no revenue, no Products, "Laughable" Timelines, Part-Time Executives, and a $600 Million Market Cap*" (the "Hunterbrook Report").

9. The Hunterbrook Report quoted an industry expert who called NNE's timeline "frankly laughable" and a former chair of the U.S. Nuclear Regulatory Commission who said flatly it "won't happen" citing competitors with more expertise and resources that have taken 15-20 years for similar projects.

10. The Hunterbrook Report also revealed that NNE's executive chairman and president, CEO, and CFO work as independent contractors at the company and continue to hold senior management positions at other penny-stock companies.

11. Most significantly, the Hunterbrok Report revealed that "[a]s of July 2024, the U.S. Nuclear Regulatory Commission does not list NNE among the companies that have begun pre-application activities for the kind of reactor NNE is pitching." The Hunterbrook Report quoted an NRC public affairs officer as saying the Advanced Reactor department is "not aware of this company" and "we have not had any pre-application dealings with them." Despite Walker's claim that approvals for a uranium fuel fabrication facility were "pretty much complete," NNE appears to have "filed no permitting or regulatory application documents with the NRC" based on a review of the agency's publicly available online records.

12. NNE's share price declined over 10% after Hunterbrook released its report on July 19, 2024.

13. As the market absorbed the significance of the revelations in the Hunterbrook Report, NNE's share price continued to decline. On July 22, 2024, NNE's stock price fell from a July 19, 2024 close of $19.30 per share to a July 22, 2024 close of $15.97 per share, a 17% decline.

14. As described in greater detail below, the Company's unpersuasive response to the Hunterbrook Report and subsequent reporting in Barrons and elsewhere spurred further decline's in NNE's share price, which lost more than 48% of its value between July 19, 2024 when it closed at $19.30 per share and August 1, 2024 when it closed at $9.86 per share.

15.     Throughout the Class Period, Defendants made false and/or misleading statements, and failed to disclose material facts, including that: a) NNE's purported progress toward regulatory approval for the design of its planned micro reactors and fuel fabrication plant was nonexistent; b) NNE's timelines for commercialization were wildly optimistic, at best, and most likely impossible; c) the foregoing issues were likely to have a material negative impact on the Company's projected revenues and growth; d) as a result, the Company's financial position and/or prospects were overstated; and e) as a result, Defendants' public statements were materially false and misleading at all relevant times.

16.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

17.     The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and 1367, and pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa.

18.     This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

19.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1931(b), as the Company has its principal executive offices located in this District and conducts substantial business here.

20.     In connection with the acts, omissions, conduct, and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including but not limited to the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

21. Plaintiff Yvette Yang, as set forth in the accompanying certification, which is incorporated by reference herein, purchased NNE common stock during the Class Period and has been damaged thereby.

22. Defendant NNE, Inc. is a Nevada corporation incorporated on February 8, 2022, with its principal executive offices located at 10 Times Square, 30th Floor, New York, New York. The Company's stock trades on the Nasdaq Stock Exchange under the ticker symbol "NNE."

23. Defendant James Walker was NNE's Chief Executive Officer at all relevant times.

24. Defendant Jay Jiang Yu was NNE's Founder and Chairman at all relevant times.

25. Collectively, Defendants Walker and Yu are referred to throughout this complaint as the "Individual Defendants."

26. The Individual Defendants, because of their positions at the Company, possessed the power and authority to control the content and form of the Company's annual reports, quarterly reports, press releases, investor presentations, and other materials provided to the SEC, securities analysts, money and portfolio managers and investors, *i.e.*, the market. The Individual Defendants authorized the publication of the documents, presentations, and materials alleged herein to be misleading prior to its issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected. Because of their positions with the Company and access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

27. NNE and the Individual Defendants are referred to herein, collectively, as "Defendants."

## SUBSTANTIVE ALLEGATIONS AND FACTUAL BACKGROUND

28. Nuclear energy production and the fabrication of nuclear fuel are among the most strictly regulated and closely monitored industries in the United States. The development of new

5

nuclear reactors and new sources of enriched uranium that can be used as nuclear fuel are extraordinarily time and capital-intensive undertakings.

29. The U.S. Nuclear Regulatory Commission ("NRC") oversees and must specifically license and approve new designs. Licensing a nuclear technology development and getting it approved by the NRC, requires reviews on multiple fronts, public hearings, proposals, and reports.

30. The development of new designs for small modular reactors and fuel fabrication facilities of the kind described in NNE's public statements and regulatory filings would require multiple levels of formal review and approval by NRC before any commercial operations could begin.

31. To date, NuScale Power Corp. is the only company in the U.S. to get a small modular reactor design approved by the NRC, began the pre-application process for its design in 2008, did not receive approval from the NRC until 2023, and was not expected to bring its technology to market until 2029 at the earliest. NuScale's total development costs exceeded $9 billion before the company determined it was unable to find enough buyers to justify commercial production of its design.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

32. Before the start of the Class Period, on May 17, 2023, in a statement to the trade publication Utility Dive, Defendant Walker claimed approvals for the Company's designs for a fuel fabrication plant at the Idaho National Laboratory were "**pretty much complete**." Walker also reportedly claimed that design work on the $150 to $200 million project could begin within months and that construction starting in 2024 was "feasible."

33. The statements referenced above in ¶31 from Defendant Walker were false and misleading when made. The NRC had not had any pre-application dealings with NNE and NNE was not identified as an entity that had formally notified the NRC of its intent to engage in regulatory interactions with respect to the construction of a fuel fabrication plant at the Idaho National Laboratory.

34. The Class Period begins on May 8, 2024, the date that NNE began trading on the Nasdaq stock exchange.

35. In its prospectus dated April 4, 2024 and form S-1 dated March 19, 2024 (together the "Offering Documents") NNE made a range of false and misleading statements regarding the Company's interactions with federal regulators and its purported progress toward regulatory approval for its designs and touting its purported connection to the Idaho National Laboratory.

36. For example, NNE's free writing prospectus, dated April 4, 2024, claimed that in "[e]arly 2024, [the] Idaho National Laboratory completed its pre-conceptual reviews of our ZEUS and ODIN microreactors."

37. Similarly, NNE's S-1 dated March 19, 2024 stated:

In collaboration with the management and operating contractor of Idaho National Laboratory (or INL), an institution we regard as one of the preeminent U.S. government laboratories for nuclear energy research and development and equipped with some of the world's foremost nuclear scientists and engineers, we believe our reactors will have the potential to bring change to the global energy landscape. Our goal is to commercially launch one of these products by 2030.

Both our ZEUS and ODIN microreactors have completed the preconceptual design stage, and are currently undergoing design optimization, and certain initial physical test work, to finalize the designs ahead of more involved demonstration work. We have conducted and completed a design audit on the ODIN reactor to provide assistance with design considerations. **Additionally, the design audit for the ZEUS reactor was conducted and completed by INL in February 2024, the report of which is currently being finalized by INL. We have submitted a request for information to the U.S. Department of Energy (or DOE) to initiate the approval process for the allocation of a designated site.** This allocation is intended for the purpose of conducting testing experiments for both microreactors. We have communicated with the U.S. Nuclear Regulatory Commission (or NRC) and DOE, informing them of the current status of our microreactor designs and the estimated internal timelines for our microreactor developments, with an understanding that definite timelines will be provided as early as possible, once available, to allow the NRC to arrange the necessary personnel to oversee the microreactor licensing process.

38. NNE's S-1 dated March 19, 2024 continued, stating:

Through our subsidiary, HALEU Energy Fuel Inc., and **in coordination with DOE and INL**, we are seeking to develop a domestic High-Assay Low-Enriched Uranium (HALEU) fuel fabrication facility to supply the fuel not only for our own reactor products, but to the broader advanced nuclear reactor industry in general. We hope to have our fuel fabrication facility near INL in operation as soon as 2027.

7

39. The statements referenced above in ¶¶35-37 from NNE's Offering Documents were materially false and/or misleading when made because they incorporated Defendant Walker's earlier false claim that NNE's approvals for design work for a fuel fabrication plant at the Idaho National Laboratory were "pretty much complete" while, in truth, the NRC does not list NNE among the companies that have begun pre-application activities for the kind of reactors NNE is purportedly developing and the NRC had not had any pre-application dealings with NNE.

40. On June 20, 2024, NNE filed its 10-Q for the period ending March 31, 2024, stating that:

> We are utilizing **our existing relationship with INL** to collaborate on the design, construction and commission of our own commercial nuclear High-Assay Low-Enriched Uranium ("HALEU") fuel fabrication facility to supply fabricated fuel to the next generation of advanced nuclear reactor companies, and to supply our own reactors currently under development to the U.S. nuclear industry, the U.S. National Laboratories, and the DOE's nuclear fuel needs as necessary. We hope to have our fuel fabrication facility near INL in operation as soon as 2027. Our proposed fuel fabrication facility is intended to form part of an integrated system with the INL's facilities, being sited directly outside the INL facilities to eliminate transport over civilian roads and making use of INL's capabilities such as fuel characterization. **Our submissions to the DOE to advance this fuel facility have been supported by INL, with our submission having been reviewed and edited by INL staff, and the facility site selection led and approved by INL personnel.**

41. The statement referenced above in ¶39 from NNE's 10-Q for the period ending March 31, 2024 was materially false and/or misleading when made because it both incorporates and expands on Defendant Walker's earlier false claim that NNE's approvals for design work for a fuel fabrication plant at the Idaho National Laboratory were "pretty much complete" while, in truth, the NRC does not list NNE among the companies that have begun pre-application activities for the kind of reactors NNE is purportedly developing and the NRC had not had any pre-application dealings with NNE.

42. NNE's prospectus dated July 11, 2024, issued in connection with a supplemental offering of stock, included nearly identical claims, stating:

> **The design audits for the reactors were conducted and completed by the Idaho National Laboratory (INL). We are currently identifying sites for our test bed reactor site for the purpose of conducting testing experiments using nuclear material for both microreactors. We have communicated with the U.S. Nuclear Regulatory Commission (or NRC) and DOE, informing them of the**

**status of our microreactor designs and the estimated internal timelines for our microreactor developments**, with an understanding that definite timelines will be provided once available, to allow the NRC to arrange the necessary personnel to oversee the microreactor licensing process.

***

Through our subsidiary, HALEU Energy Fuel Inc., and in coordination with DOE, we are seeking to develop a domestic High-Assay Low-Enriched Uranium (HALEU) fuel fabrication facility to supply the fuel, not only for our own reactors, but to the broader advanced nuclear reactor industry in general. We have identified the site we intend to construct the facilities and have begun to build the team to design and develop the facility.

43. The statements referenced above in ¶41 from NNE's Offering Documents were materially false and/or misleading when made because they incorporated Defendant Walker's earlier false claim that NNE's approvals for design work for a fuel fabrication plant at the Idaho National Laboratory were "pretty much complete" while, in truth, the NRC does not list NNE among the companies that have begun pre-application activities for the kind of reactors NNE is purportedly developing and the NRC had not had any pre-application dealings with NNE.

### THE TRUTH IS REVEALED

44. On July 19, 2024, Hunterbrook Media published a report entitled "Fission Impossible: Nano Nuclear has no revenue, no Products, "Laughable" Timelines, Part-Time Executives, and a $600 Million Market Cap." As described above, the Hunterbrook Report quoted industry experts who called NNE's timeline for commercialization "frankly laughable," revealed that NNE's top management were independent contractors also working as executives of a number of other penny-stock companies, and that officials as the U.S. NRC and DOE were not aware of NNE and the Company had not begun pre-application activities for the kind of reactor NNE is pitching, and that NNE had filed no permitting or regulatory application documents with the NRC.

45. The Hunterbrook Report additionally quoted from interviews with industry experts who were deeply skeptical of NNE's claims and projected timelines for commercialization. Allison Macfarlane, the director of the University British Columbia's School of Public Policy and Global Affairs and a prior chair of the NRC, was quoted as saying NNE's timeline "won't happen" noting that licensing alone could easily take six or seven years.

46. Similarly, Paul Dorfman, a visiting fellow at the University of Sussex's Science Policy Research Unit said NNE "cannot produce this stuff in the time scales that they promise," calling it "an impossibility" and NNE's projected timeline "frankly laughable."

47. The Hunterbrook Report additionally revealed that NNE was not identified as a reactor designer or non-power researcher and test reactors that have formally notified the NRC of their intent to engage in regulatory interactions.

48. Additionally, the Hunterbrook Report noted that NNE's auditor Withum Smith + Brown, was sanctioned and fined $2 million by the Public Company Accounting Oversight Board in February of 2024 for "for taking on hundreds of SPAC clients without necessary resources" to properly monitor them.

## LOSS CAUSATION/ECONOMIC LOSS

49. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss, *i.e.*, damages, suffered by Plaintiff and the Class.

50. On July 19, 2024, the Hunterbrook Report revealed that NNE's purported progress towards regulatory approval for its microreactor designs and fuel fabrication facility was wildly overstated.

51. NNE's share price declined over 10% after Hunterbrook released its report on July 19, 2024.

52. As the market absorbed the significance of the revelations in the Hunterbrook Report, NNE's share price continued to decline. On July 22, 2024, NNE's stock price fell from a July 19, 2024 close of $19.30 per share to a July 22, 2024 close of $15.97 per share, a 17% decline.

53. After the market closed on July 23, 2024, in an exclusive interview with Benzinga, NNE's Chairman, Jay Yu, and CEO, James Walker, responded to the allegations in the Hunterbrook Report. Yu claimed Hunterbrook Media had "ulterior motives" and that "none of what is aid can be taken seriously, by anyone." Walker claimed the experts quoted in the Hunterbrook Report, Allison Macfarland and Paul Dormfan, were "known to be anti-nuclear and would never say anything good about any nuclear venture." Walker also claimed the authors of

10

the Hunterbrook Report "lack[ed] education" on nuclear reactors and that microreactors historically took two to three years to license.

54. Yu also disputed the claim in the Hunterbrook Report that its authors reached out to the Company seeking comment. Benzinga's article was later updated to note that "Hunterbrook Media provided Benzinga with two emails it said were sent to Nano Nuclear earlier in July requesting comment."

55. In reaction to this interview, NNE's share price dropped 7% the following day, falling from a previous close of $15.49 per share on July 23, 2024 to $14.37 on July 24, 2024.

56. Finally, on July 31, 2024, before the market opened, Barron's published an article entitled *Andrew Cuomo is Back in Business—the Nuclear Power Business*. The Barron's article noted that NNE's "prospectus notes that the company hasn't built or patented any nuclear reactor. Its board of directors includes a Florida orthopedist and a New York pharmacist. As of mid-July, Nano's fillings said it had no full-time employees." It also confirmed that "securities filings show that Nano's top executives have spent much of the past decade promoting Canadian mining penny stocks" and that NNE had "produced little more than a prospectus."

57. On this news, NNE's stock dropped a further 7% to $11.81 on July 31, 2024 from a previous days close of $12.75.

58. The decline in NNE's stock price is directly attributable to the revelations concerning the Company's false and misleading statements about its regulatory approvals and timelines for commercialization and its unpersuasive response to the allegations in the Hunterbrook Report and subsequent media reporting.

## ADDITIONAL SCIENTER ALLEGATIONS

59. As alleged herein, Defendants acted with scienter in that they knew the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents and in actions intended to manipulate the market

11

price of NNE's common stock as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding NNE, their control over, and/or receipt or modification of, the Company's allegedly materially misleading misstatements, and/or their associations with the Company that made them privy to confidential proprietary information concerning NNE, participated in the fraudulent scheme alleged herein.

60. As such, the Individual Defendants knew or were reckless in not knowing of the undisclosed facts detailed herein.

## APPLICABILITY OF THE
## FRAUD-ON-THE-MARKET DOCTRINE

61. Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine that, among other things:

   a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

   b) The omissions and misrepresentations were material;

   c) The Company's common stock traded in efficient markets;

   d) The misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

   e) Plaintiff and other members of the class purchased the Company's common stock between the time Defendants misrepresented or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

62. At all relevant times, the markets for the Company's stock were efficient for the following reasons, among others: (i) the Company filed periodic public reports with the SEC; and (ii) the Company regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures such as

communications with the financial press, securities analysts, and other similar reporting services. Plaintiff and the Class relied on the price of the Company's common stock, which reflected all information in the market, including the misstatements by Defendants.

## NO SAFE HARBOR

63. The statutory safe harbor provided for forward-looking statements under certain conditions does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not identified as forward-looking statements when made.

64. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

## CLASS ACTION ALLEGATIONS

65. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or otherwise acquired NNE common stock between May 8, 2024 through July 18, 2024, inclusive. Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

66. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

67. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

    a) Whether Defendants violated the Exchange Act;

    b) Whether Defendants omitted and/or misrepresented material facts;

  c) Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

  d) Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

  e) Whether the price of the Company's stock was artificially inflated; and

  f) The extent of damage sustained by Class members and the appropriate measure of damages.

68. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct alleged herein.

69. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests that conflict with those of the Class.

70. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

### COUNT I
### For Violations of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

71. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

72. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

73. Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact

and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon those who purchased or otherwise acquired the Company's securities during the class period.

74. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock. Plaintiff and the Class would not have purchased the Company's common stock at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

**COUNT II**
**For Violation of §20(a) of the Exchange Act**
**(Against All Defendants)**

75. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

76. Defendants acted as controlling persons of the Company within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions at the Company, the Individual Defendants had the power and authority to cause or prevent the Company from engaging in the wrongful conduct complained of herein. The Individual Defendants were provided with or had unlimited access to the documents where false or misleading statements were made and other statements alleged by Plaintiff to be false or misleading both prior to and immediately after their publication, and had the ability to prevent the issuance of those materials or to cause them to be corrected so as not to be misleading. The Company controlled the Individual Defendants and all of its employees. By reason of such conduct, Defendants are liable pursuant to §20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and

a certification of Plaintiff as class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Plaintiff's counsel as Lead Counsel;

    B. Awarding compensatory and punitive damages in favor of Plaintiff and the other class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon.

    C. Awarding Plaintiff and other members of the Class their reasonable costs and expenses in this litigation, including attorneys' fees, experts' fees and other reasonable costs and disbursements; and

    D. Awarding Plaintiff and the other Class members such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

Dated: August 9, 2024

Respectfully submitted,

*/s/ Jeffrey C. Block*
Jeffrey C. Block
Sarah Delaney
**BLOCK & LEVITON LLP**
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600 phone
(617) 507-6020 fax
jeff@blockleviton.com
sarah@blockleviton.com

*Attorneys for Plaintiff and Proposed Lead Counsel*