**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HONGYU XIE, individually and on behalf of all others similarly situated,<br><br>                              plaintiff,<br><br>                    v.<br><br>NANO NUCLEAR ENERGY INC., JAY YU, JAMES WALKER, and JAISUN GARCHA<br><br>                              defendants. | Case No.: 1:24-cv-06057-JMF<br><br><br>CLASS ACTION |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT**

Eric Landau (EL1420)
Travis S. Biffar (*admitted pro hac vice*)
ELLENOFF GROSSMAN & SCHOLE LLP
949 South Coast Drive, Suite 200
Costa Mesa, CA 92626
*elandau@egsllp.com*
*tbiffar@egsllp.com*
(949) 416-3100 / (949) 416-0250 (fax)

John B. Horgan (JH8106)
Joanna R. Cohen (JC4020)
ELLENOFF GROSSMAN & SCHOLE LLP
1345 Avenue of the Americas, 11th Floor
New York, NY 10105
*jhorgan@egsllp.com*
*jcohen@egsllp.com*
(212) 370-1300 / (212) 370-7889 (fax)

*Attorneys for defendants*

**Table of Contents**

PRELIMINARY STATEMENT ..................................................................................................... 1

BACKGROUND .......................................................................................................................... 2

I.      THE PARTIES AND THE RELEVANT CAST OF CHARACTERS ............................... 2

II.     CLAIMS AND GOVERNING LEGAL STANDARDS ................................................. 3

ARGUMENT ............................................................................................................................... 4

I.      PLAINTIFF FAILS TO ALLEGE A FALSE STATEMENT OR OMISSION ................ 4

    A.      Plaintiff Does Not Allege Falsity with Particularity .................................................... 4

        1.     Plaintiff's Strawmen .................................................................... 4

        2.     Nano's Personnel Management ............................................................ 7

        3.     Alleged Omissions ................................................................... 9

    B.      Bespeaks Caution and PSLRA Safe Harbor ............................................ 11

    C.      Statements of Puffery and Opinion Are Not Actionable ............................. 14

        1.     Nano's "World Class" Team ................................................... 15

        2.     Nano's Estimated Timelines .................................................... 15

II.     PLAINTIFF FAILS TO ALLEGE A STRONG INFERENCE OF SCIENTER ............ 17

    A.      Plaintiff Fails to Plead Scienter Based on Motive and Opportunity ........................... 18

        1.     Compensation and Stock Ownership .................................................. 18

        2.     Unrelated Transactions ........................................................... 19

    B.      Plaintiff Fails to Plead Scienter Based on Conscious Misbehavior or Recklessness . 20

        1.     The "Core Operations" Doctrine ................................................. 20

        2.     Expertise ................................................................... 21

        3.     Plaintiff's Confidential Witness .................................................. 22

        4.     Part-time Employment Status ..................................................... 24

III.    PLAINTIFF FAILS TO PLEAD LOSS CAUSATION .............................................. 25

    A.      The Hunterbrook Article ............................................................ 26

    B.      The Benzinga Article ............................................................... 27

    C.      The Barron's Article ............................................................... 28

IV.    PLAINTIFF'S SECTION 20(a) COUNT FAILS TO STATE A CLAIM ..................... 28

CONCLUSION ........................................................................................................................ 29

## Table of Authorities

**Cases**

*Abely v. Aeterna Zentaris Inc.*,
No. 12 CIV. 4711 PKC, 2013 WL 2399869 (S.D.N.Y. May 29, 2013) ................................. 22

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020) ..................................................................................... 15

*ATSI Comms., Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007) ................................................................................. 4, 28

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ................................................................................................ 10

*Campo v. Sears Holding Corp.*,
635 F. Supp. 2d 323 (S.D.N.Y. 2009) ...................................................................... 24

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
750 F.3d 227 (2d Cir. 2014) ..................................................................................... 25

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
450 F. Supp. 3d 379 (S.D.N.Y. 2020) .......................................................... 11, 27, 28

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014) ....................................................................................... 9

*Colbert v. Rio Tinto PLC*,
824 F. App'x 5 (2d Cir. 2020) ................................................................................... 10

*DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*,
323 F. Supp. 3d 393 (S.D.N.Y. 2018) ..................................................................... 25

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) ................................................................................................ 25

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009) ............................................................................... 17, 18

*Elkind v. Liggett & Myers, Inc.*,
635 F.2d 156 (2d Cir.1980) ................................................................................ 27, 28

*Fait v. Regions Fin. Corp.*,
655 F.3d 105 (2d Cir. 2011) ............................................................................... 15, 16

*Francisco v. Abengoa, S.A.*,
481 F. Supp. 3d 179 (S.D.N.Y. 2020) .......................................................... 18, 23, 24

*Gagnon v. Alkermes PLC*,
368 F. Supp. 3d 750 (S.D.N.Y. 2019) ...................................................................... 21

*Glantz v. James River Grp. Holdings, Ltd.*,
No. 23-CV-10000 (LJL), 2025 WL 278440 (S.D.N.Y. Jan. 23, 2025) ..................... 21

*Glaser v. The9, Ltd.*,
772 F. Supp. 2d 573 (S.D.N.Y. 2011) ................................................................. 18, 22

*Golla v. Neovasc, Inc.*,
No. 22-361-CV, 2023 WL 2469770 (2d Cir. Mar. 13, 2023) .................................... 28

*Greenhouse v. MCG Cap. Corp.*,
392 F.3d 650 (4th Cir. 2004) ................................................................................... 10

*Gregory v. ProNAi Therapeutics Inc.*,
297 F. Supp. 3d 372 (S.D.N.Y. 2017) ...................................................................... 11

*Halperin v. eBanker USA.com, Inc.*,
295 F.3d 352 (2d Cir. 2002) ............................................................................... 12, 13

*Hawes v. Argo Blockchain plc*,
   No. 23-CV-7305 (CM), 2024 WL 4451967 (S.D.N.Y. Oct. 9, 2024) ........................... 21

*Hirsch v. Arthur Andersen & Co.*,
   72 F.3d 1085 (2d Cir. 1995)..................................................................................... 5

*In re Doral Fin. Corp. Sec. Litig.*,
   563 F. Supp. 2d 461 (S.D.N.Y.2008)........................................................................ 24

*In re EHang Holdings Ltd. Sec. Litig.*,
   646 F. Supp. 3d 443 (S.D.N.Y. 2022)....................................................................... 26

*In re Ferrellgas Partners, L.P., Sec. Litig.*,
   No. 16 CIV. 7840, 2018 WL 2081859 (S.D.N.Y. Mar. 30, 2018) ........................... 23

*In re Genius Brands Int'l, Inc. Sec. Litig.*,
   97 F.4th 1171 (9th Cir. 2024) .................................................................................. 27

*In re Ideanomics, Inc. Sec. Litig.*,
   No. 20-CV-4944, 2022 WL 784812 (S.D.N.Y. Mar. 15, 2022) ............................... 26

*In re Int'l Bus. Machs. Corp. Sec. Litig.*,
   163 F.3d 102 (2d Cir. 1998)..................................................................................... 15

*In re Lululemon Sec. Litig.*,
   14 F. Supp. 3d 553 (S.D.N.Y. 2014) ............................................................ 16, 17, 22

*In re MINISO Grp. Holding Ltd. Sec. Litig.*,
   No. 22-CV-9864 (ER), 2024 WL 759246 (S.D.N.Y. Feb. 23, 2024)....................... 26

*In re Omnicom Grp., Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2014)......................................................................... 25, 26, 28

*In re Philip Morris Int'l Inc. Sec. Litig.*,
   437 F. Supp. 3d 329 (S.D.N.Y. 2020)....................................................................... 15

*In re Progress Energy, Inc.*,
   371 F. Supp. 2d 548 (S.D.N.Y. 2005)....................................................................... 27

*In re ProShares Tr. Sec. Litig.*,
   728 F.3d 96 (2d Cir. 2013)....................................................................................... 12

*In re PXRE Grp., Ltd. Sec. Litig.*,
   600 F. Supp. 2d 510 (S.D.N.Y. 2009)....................................................................... 20

*In re Sierra Wireless, Inc. Sec. Litig.*,
   482 F. Supp. 2d 365 (S.D.N.Y.2007)........................................................................ 22

*In re Synchrony Fin. Sec. Litig.*,
   988 F.3d 157 (2d Cir. 2021).................................................................................. 3, 4

*In re Time Warner Inc. Sec. Litig.*,
   9 F.3d 259 (2d Cir. 1993)........................................................................................... 9

*In re Vivendi S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016)..................................................................................... 14

*In re Weight Watchers Int'l Inc. Sec. Litig.*,
   504 F. Supp. 3d 224 (S.D.N.Y. 2020)......................................................................... 4

*International Code Council, Inc. v. UpCodes Inc.*,
   43 F.4th 46 (2nd Cir. 2022) ..................................................................................... 14

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001)............................................................................... 18, 23

*Leadersel Innotech ESG v. Teladoc Health, Inc.*,
   No. 23-1112-CV, 2024 WL 4274362 (2d Cir. Sept. 24, 2024) ............................... 14

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005)............................................................................................ 25
*Loc. No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Exp. Co.*,
   724 F. Supp. 2d 447 (S.D.N.Y. 2010)............................................................................. 23
*Luce v. Edelstein*,
   802 F.2d 49 (2d Cir.1986)................................................................................................. 8
*MacNaughton v. Young Living Essential Oils, LC*,
   67 F.4th 89 (2d Cir. 2023) .............................................................................................. 14
*Macquarie Infrastructure Corp. v. Moab Partners, L. P.*,
   601 U.S. 257 (2024)..................................................................................................... 9, 10
*Malin v. XL Cap. Ltd.*,
   499 F. Supp. 2d 117 (D. Conn. 2007)............................................................................. 24
*Maso Cap. Invs. Ltd. v. E-House (China) Holdings Ltd.*,
   No. 22-355, 2024 WL 2890968 (2d Cir. June 10, 2024) .................................................. 4
*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)....................................................................................... 18, 20
*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015)......................................................................................................... 15
*Patel v. Koninklijke Philips N.V.*,
   No. 21-CV-4606 (ERK), 2024 WL 4265758 (E.D.N.Y. Sept. 23, 2024)......................... 22
*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*,
   89 F. Supp. 3d 602 (S.D.N.Y. 2015)............................................................................... 18
*Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.*,
   694 F. Supp. 2d 287 (S.D.N.Y. 2010)............................................................................. 22
*Santa Fe Indus. v. Green*,
   430 U.S. 462 (1977)........................................................................................................... 8
*Saskatchewan Healthcare Employee's Pension Plan v. KE Holdings Inc.*,
   718 F. Supp. 3d 344 (S.D.N.Y. 2024)............................................................................. 18
*SEC v. Thompson*,
   238 F. Supp. 3d 575 (S.D.N.Y. 2017)............................................................................. 11
*Sedighim v. Donaldson, Lufkin & Jenrette, Inc.*,
   167 F. Supp. 2d 639 (S.D.N.Y. 2001)............................................................................... 5
*Slayton v. Am. Exp. Co.*,
   604 F.3d 758 (2d Cir. 2010).......................................................................................... 7, 14
*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*,
   552 U.S. 148 (2008)........................................................................................................... 4
*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)......................................................................................................... 17
*Venkataraman v. Kandi Techs. Grp., Inc.*,
   No. 20 CIV. 8082 (LGS), 2021 WL 4952260 (S.D.N.Y. Oct. 25, 2021) ......................... 18

**Statutes**
15 U.S.C. § 77z–2(b)(2)(D) ................................................................................................ 11
15 U.S.C. § 78j(b) ................................................................................................................. 3
15 U.S.C. § 78t(a) ................................................................................................................. 3
15 U.S.C. § 78u-4 ................................................................................................................. 3
15 U.S.C. § 78u-4(b)(2)(A)................................................................................................. 17

15 U.S.C. § 78u–5(b)(2)(D) ....................................................................................... 11
15 U.S.C. § 78u–5(c)(1) ............................................................................................ 14
15 U.S.C. § 78u-5(i)(1)(B-C) ................................................................................... 14

**Rules**
Fed. R. Civ. Proc. 9(b) ............................................................................................... 3

**Other Authorities**
Barbara A. Bliss, Peter Molk, Frank Partnoy, *Negative Activism*,
    97 Wash. U.L. Rev. 1333 (2020) ........................................................................ 27

## PRELIMINARY STATEMENT

Nano Nuclear Energy Inc. ("Nano") told investors what it planned to do and warned investors of the risks. Now, Nano and its management are sued under the federal securities laws for doing what it said, in the way it said it would do it.

In her second amended complaint, lead plaintiff Hongyu Xie ("Plaintiff") offers four principal sets of allegations to establish fraud: that Nano's timelines are too optimistic; that Nano's management, scientific, and technical teams are not full-time; that Nano does not publicly criticize its management and advisors; and that Nano does not pay enough attention to the opinions of former grant writers, competitors, and anti-nuclear pundits, none of whom were involved with the preparation of Nano's public disclosures or in its decision-making process. In an all-to-familiar refrain, Plaintiff claims the "truth" was revealed by a negative article published by a short seller, admittedly based on public information, and seeks to recover for a very temporary downturn in Nano's stock price caused by this short seller.

Plaintiff spends pages hurling insults at everyone associated with Nano, but a fraud claim must allege particularized facts, not invective. Nano said what it planned to do and is doing it. Assembling a panel of naysayers to bemoan Nano's projections and timelines about events years in the future does not impugn the integrity of management's sincere belief in their mission. Every one of Plaintiff's charging allegations misses the mark by failing to plead sufficient facts to establish a false statement or omission, a strong indicia of scienter, and proximate causation.

This is Plaintiff's second bite at the apple, having opted to amend her complaint after defendants moved to dismiss her first amended complaint on February 21, 2025. ECF No. 55. As Plaintiff's redlined pleading demonstrates, her changes are cosmetic and do not cure the pleading deficiencies identified by defendants. *See* ECF No. 59-1. Notably, Plaintiff continues to misquote and misattribute statements in public filings and articles, despite defendants correcting these

errors and submitting complete copies of the documents with their first motion to dismiss. Further amendment would be futile. This case should be dismissed.

BACKGROUND[1]

## I.    THE PARTIES AND THE RELEVANT CAST OF CHARACTERS

Plaintiff is a day trader who purchased and sold Nano's stock between June 25, 2024 and July 17, 2024. ¶23; ECF No. 29-2 at 4.

Nano is an early-stage nuclear development company working toward developing portable clean energy solutions, including nuclear microreactors and fuel fabrication facilities, among other products and services. ¶¶24, 32. Nano is listed under the trading symbol "NNE" on the NASDAQ stock exchange. ¶24. Nano's business plan conserves investor funds by retaining officers, directors, and advisors on a part-time consulting basis, with the goal of eventually converting them to employment contracts. Ex. 1 at 94-96. Nano's business plan also includes advancing its nuclear technology and leveraging its assets by acquiring complimentary companies with, or assets consisting of, strategic patents, contracts, and expertise. *Id*. at 87-90. As of the date of the SAC, Nano's May 2024 initial public offering ("IPO") price of $4.00 had increased to $30.26 and its market capitalization from $116 million to over $1 billion.[2]

Defendant Jay Yu is Chairman of Nano's Board of Directors and President. ¶26. Defendant James Walker is a director and Nano's Chief Executive Officer ("CEO"). ¶25. Defendant Jaisun Garcha is Nano's Chief Financial Officer ("CFO"), not a director. ¶27.

---

[1] All paragraph references ("¶") are to the Second Amended Class Action Complaint filed on March 14, 2025, ECF No. 59 ("SAC"). All exhibit references ("Ex.") are to the accompanying Request for Judicial Notice.

[2] https://finance.yahoo.com/quote/NNE/history/?period1=1712273627&period2=1741996800.

"CW1" is a confidential witness alleged to be a former grant writer for Nano, who was never a member of management, is not alleged to have experience in the nuclear industry, and who left Nano three months before the IPO. ¶31. Plaintiff also relies on the opinions of nuclear consultants, with publicly known biases against nuclear power, and competitors of Nano to throw a wet blanket on Nano's prospects for success: Paul Dorfman[3] (¶80); Allison Macfarlane[4] (¶81); M.V. Ramana[5] (¶89); Dr. Matthew Memmott[6] (¶85); and Stephen Burns (¶78). None are alleged to have spoken with or expressed their views to anyone at Nano. None are alleged to have found a misstatement of fact in any of Nano's public filings.

## II.    CLAIMS AND GOVERNING LEGAL STANDARDS

Plaintiff brings two counts for alleged securities fraud under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) & 78t(a), on behalf of a putative class of purchasers of Nano's securities from May 8, 2024 to July 30, 2024.

Complaints alleging securities fraud are subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure, Fed. R. Civ. Proc. 9(b), and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4. *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 166 (2d Cir. 2021). Rule 9(b) requires that "a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. Proc. 9(b). To satisfy this standard, a plaintiff must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why

---

[3] https://www.theguardian.com/commentisfree/2011/apr/13/nuclear-power-sustainable-energy.
[4] https://reneweconomy.com.au/the-end-of-oppenheimers-nuclear-energy-dream-modular-reactors-supported-by-ideology-alone/.

[5] https://www.versobooks.com/products/3013-nuclear-is-not-the-solution.

[6] https://news.byu.edu/byu-profs-create-safer-system-to-produce-nuclear-energy.

the statements were fraudulent." *Synchrony*, 988 F.3d at 167. "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI Comms., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

To state a claim under Section 10(b) that defendants made material misrepresentations or omissions, Plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Maso Cap. Invs. Ltd. v. E-House (China) Holdings Ltd.,* No. 22-355, 2024 WL 2890968, at *2 (2d Cir. June 10, 2024) (quoting *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).

## ARGUMENT

## I.    PLAINTIFF FAILS TO ALLEGE A FALSE STATEMENT OR OMISSION[7]

### A.    Plaintiff Does Not Allege Falsity with Particularity

#### 1.    *Plaintiff's Strawmen*

Throughout the SAC, Plaintiff creatively reimagines Nano's public statements and liberally seasons her pleading with hyperbole. But this case is about Nano's public statements and information publicly available to all shareholders, not the salacious nature of the allegations. "If the complaint's allegations 'conflict with the plain language of the publicly filed disclosure documents, the disclosure documents control, and the court need not accept the allegations as true.'" *In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 244 (S.D.N.Y. 2020)

---

[7] Plaintiff repackages the same allegations multiple times in the SAC. *See, e.g.*, ¶¶143, 164, 183, 185 (reactor timelines estimates), ¶¶148, 174, 177, 187 (fuel fabrication facility plans). Defendants decline to follow Plaintiff down the rabbit hole and will address each category of allegations only once. For example, the SAC repeatedly discusses the opinions of CW1. *See* ¶¶63–68, 73, 76, 99–107, 144, 164, 170, 173, 177, 183, 185, 231. Nano will address CW1 *infra* at Section II.B.3.

(quoting *Sedighim v. Donaldson, Lufkin & Jenrette, Inc.*, 167 F. Supp. 2d 639, 646–47 (S.D.N.Y. 2001)).

        a)      <u>Mr. Walker's Pre-IPO Statement Does Not Refer to Design Approvals</u>

Though superseded by events, Plaintiff attacks a pre-IPO statement made by Mr. Walker over a year before she became a stockholder. ¶136. Even if Mr. Walker's statement were made within the putative class period, Plaintiff's allegation fails because she misattributes the quote "pretty much complete" to design approvals for Nano's fuel fabrication facility. Design approval status is not mentioned at all in the *Utility Dive* article.

The actual statements the *Utility Dive* article's author attributed to Mr. Walker read as follows:

> [d]esign work on the $150 million to $200 million project can begin in the next few months and a construction start next year is "feasible." Approvals are "pretty much complete," he said.

Ex. 3, *Nano Nuclear Technology to build fuel fabrication plant at Idaho National Lab* at p.1; ¶40 at n.2. The words "feasible" and "pretty much complete" are the only direct quotes from Mr. Walker, the rest was inserted by the article's author. Although the article does not specify the nature of the approvals at all, one fact is certain: these approvals could not be approvals of the design work for Nano's planned fuel fabrication plant because, according to the article, that design work had not yet begun. *Id*. Obviously, approvals cannot be obtained for design work that had not started yet. The IPO prospectus confirms the same. Ex. 2 at 86 ("[W]e plan … to commence the design work on our fuel fabrication facility in the second half of 2024."). The actual words of the article defeat Plaintiff's characterizations, even at the pleading stage. *See Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1095 (2d Cir. 1995) (refusing to credit

"attenuated allegations" "contradicted both by more specific allegations in the Complaint and by facts of which [the Court] may take judicial notice").

Plaintiff further argues the statement attributed to Mr. Walker was false because "[t]he [Nuclear Regulatory Commission ("NRC")] had not had any pre-application dealings with [Nano]." ¶137. There is nothing in this article to indicate or suggest Mr. Walker said anything about the NRC, much less representing Nano had any pre-application dealings with this agency. *See* Ex. 3. Actual words defeat characterizations.

b)    Nano Never Claimed a Lack of Government Funding Was an Advantage

According to Plaintiff, Nano "falsely told investors that [the lack of government funding] was an advantage." ¶¶149-50, 175, 188-89. Nano never said this, and Plaintiff knows it, because she quotes the appropriate passage from Nano's May 2024 IPO Prospectus, which reads, "[w]hile we will seek available government funding opportunities in future, the absence of government support does not impede our progress in advancing our research, business, or technological developments." ¶¶149, 188 (emphasis added); Ex. 1 at 12. The word "advantage" is not mentioned. Rather, Nano professes its progress would not be impeded by the lack of government funding.

c)    Nano's Future Revenues Are Not Solely Dependent on Regulatory Approvals

In an interview published in *The Ignition Newsletter*, Mr. Yu stated his opinion that Nano was well-positioned to succeed in part because of additional non-microreactor revenue streams. The article states that "transportation and HALEU businesses will be key to producing revenue in the near term." ¶157; Ex. 14. Plaintiff labels this opinion misleading because Nano had not yet begun the regulatory approval process. ¶158. There are numerous problems here.

6

First, even limiting Mr. Yu's statement to fuel transportation and fabrication, which ignores Nano's earlier S-1 and its final IPO prospectus filed the same day as the Ignition Newsletter article, his opinion was these revenue streams would produce revenues sooner than Nano's microreactors and there are no allegations to suggest Mr. Yu did not believe what he said at the time he gave this interview. *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010).

Second, Plaintiff omits reference to Nano's planned nuclear consulting business. ¶157 (addressing only Nano's fuel transportation and fabrication business lines). Mr. Yu's opinion was not new, but merely reflects Nano's March 2024 S-1 and May 2024 prospectus that disclosed Nano was planning to seek out and acquire "nuclear service support and consultation services" businesses to provide Nano with "immediate revenue post-acquisition." Exs. 1 at 87-88; 2 at 87-88.

Third, Plaintiff's allegation does not comport with his actual statement. Mr. Yu's opinion that non-microreactor revenue streams will be the key to producing revenue in the near term is not rendered misleading because he did not also state in the same sentence that other revenue streams require regulatory approvals (¶¶157-58), a point discussed and disclosed in all of Nano's public filings (*see infra* n.11). Plaintiff also ignores that Nano's consulting business would not require such approvals and could provide revenues in the near term.

### 2.    *Nano's Personnel Management*

Plaintiff castigates defendants for not devoting their full-time attention to Nano (¶¶139-142). Plaintiff mistakenly asserts Nano did not disclose this fact (¶7), and incorrectly represents that defendants claim to "spen[d] a majority of their hours on [Nano] and characterized risk that their 'divided focus' posed to the business as purely hypothetical" (¶141). None of this reflects the public record. *Id*.

First, Nano's public filings explicitly state that *none* of the individual defendants work exclusively for Nano and all of them have other obligations. *See* ¶141. *See also* Exs. 4–6. Indeed, Nano's S-1 includes an express written risk factor covering this point. Ex. 1 at 94.

Second, the SAC provides no support for the notion that allowing management to work with other businesses has negatively impacted Nano. ¶¶141–42. Plaintiff pleads no facts to indicate defendants' other responsibilities have caused delays in either decision making or the execution of Nano's business plan. This and most of Plaintiff's allegations smack of an attack on operations and are misplaced here because breaches of fiduciary duty or "corporate mismanagement" do not amount to securities fraud under Section 10(b). *Santa Fe Indus. v. Green*, 430 U.S. 462, 476, 479 (1977); *Luce v. Edelstein*, 802 F.2d 49, 55 (2d Cir.1986). Nonetheless, defendants are compelled to note that Nano continues to grow and execute on its business plan, including commencing pre-application proceedings with the NRC (¶74), obtaining a worldwide nuclear patent portfolio,[8] moving forward with its advanced demonstration facility (a key step in regulatory approval),[9] and increasing Nano's IPO share price nearly eight-fold as of the filing of the SAC.[10]

At bottom, Plaintiff takes issue with Nano's business plan, which keeps initial costs low by retaining good people on a part-time basis instead of burdening Nano with staggering debt by building out an infrastructure upfront. Plaintiff knew Nano's business plan before she invested and knew everyone involved because Nano disclosed all of this in its public filings. Certainly,

---

[8] https://nanonuclearenergy.com/nano-nuclear-energy-expands-intellectual-property-portfolio-with-acquisition-of-key-worldwide-patents-for-composite-moderator-for-nuclear-reactor-systems/

[9] https://nanonuclearenergy.com/nano-nuclear-energy-engages-arobotics-company-and-commits-to-multimillion-dollar-investment-to-build-out-its-new-advanced-demonstration-facility/

[10] https://finance.yahoo.com/quote/NNE/history/?period1=1741910400&period2=1741996800.

she cannot stake a securities fraud claim on the fact that Nano is building a company just as it planned to do.  If she did not believe in this approach and disliked management, she should have bought stock in one of Nano's competitors and decided to forego investing on the ground floor of a company that rewarded investors with fantastic gains in its first year as a public company.

### 3.    *Alleged Omissions*

Under Section 10(b), even where a duty exists, failure to disclose information is actionable "only if the omission renders affirmative statements made misleading." *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 265 (2024).  Plaintiff's principal allegations of omission boil down to demands that Nano recite negative information about management and its business associates outside of Nano's business operations. However, "disclosure is not a rite of confession." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014).

First, Plaintiff criticizes Nano's for not performing and publishing an analysis of its competitors, but fails to identify any duty for Nano to do so or explain how the alleged omission makes Nano's estimation of its own timelines misleading. ¶¶155–56. "[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact." *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993). Notwithstanding, Nano's S-1 cautions investors that "nearly all of [our competitors] are significantly larger and have more cash resources than we do."  Ex. 1 at 93. Similarly, Plaintiff believes Nano should have provided extensive details about Centrus Energy Corp., even though the two companies only entered into a non-binding agreement to explore the possibility of working together. ¶68. Plaintiff does not explain the significance of providing the level of detail she wants disclosed, especially before a deal has been cut.

Second, Plaintiff alleges as misleading Nano's disclosures about its advisors, General Wesley Clark and The Honorable Andrew Cuomo, and its auditor, WithumSmith+Brown, PC ("Withum"), because Nano did not publicly criticize them. ¶¶151–54, 161–62. To start, Plaintiff identifies no duty on Nano's part to do so. *Id*. "Silence, absent a duty to disclose, is not misleading under Rule 10b–5." *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988). Plaintiff also fails to explain how the absence of the complained-of information makes Nano's affirmative statements misleading. *Macquarie*, 601 U.S. at 265. That Withum was fined for taking on too many clients does not make Nano's statements that it retained Withum and relied on its expertise misleading. Rather, it underscores that Withum was in high demand due to its expertise. ¶¶153–54. Similarly, Nano's announcement about adding Gen. Clark and Gov. Cuomo as advisors is not rendered misleading because Nano did not recount negative events during their long careers. Finally, Withum's fine was publicly disclosed by the Public Company Accounting Oversight Board (¶110 n.60), and the extensive backgrounds of Gen. Clark and Gov. Cuomo are well known and publicly available online (¶106).

Fourth, borrowing almost entirely from a short-seller article (¶¶128-31), Plaintiff lambasts Messrs. Yu, Walker, and Garcha for their other business ventures, which have nothing to do with Nano's public statements and do not render any of them misleading. Nano disclosed management's other current ventures in its S-1. Ex. 1 at 36, 102–03. Investors were free to delve into the details. Courts presume that the reasonable investor "is neither an ostrich, hiding her head in the sand from relevant information, nor a child, unable to understand the facts and risks of investing." *Colbert v. Rio Tinto PLC*, 824 Fed. App'x 5, 11 (2d Cir. 2020) (quoting *Greenhouse v. MCG Cap. Corp*., 392 F.3d 650, 656 (4th Cir. 2004)).

Fifth, Plaintiff contends Nano's May 2024 announcement to advance an "exclusive patented license" was misleading because the patent belongs to Battelle Energy Alliance, LLC ("Battelle"). ¶160. This is a headscratcher, because Nano disclosed it had exclusively licensed the patent from Battelle in its May 2024 Prospectus. Ex. 2 at 14, 92.

Sixth, Plaintiff faults Nano for disclosing that it conducted and completed design audits with the Idaho National Laboratory ("INL") for its ODIN and ZEUS reactors. Plaintiff does not allege that audits did not occur; rather, she asserts these statements were misleading because one of Nano's competitors says INL design audits are "informal." ¶¶88, 171–72. A competitor's subjective assessment of an audit's formality does not change the fact that Nano completed the design audits, and INL prepared reports to provide external input and assistance to validate Nano's technology. ¶184.

### B.    Bespeaks Caution and PSLRA Safe Harbor

"[T]he federal securities laws have two separate, but similar, protections for forward-looking statements." *SEC v. Thompson*, 238 F. Supp. 3d 575, 602 (S.D.N.Y. 2017). The first is the "bespeaks caution" doctrine that protects forward-looking statements, even when made in connection with an IPO. *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 396 (S.D.N.Y. 2020). The second is the PSLRA's statutory "safe harbor" for forward-looking statements, although the safe harbor "does not apply to statements made in connection with an initial public offering, such as an IPO prospectus." *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 398 (S.D.N.Y. 2017), *aff'd*, 757 F. App'x 35 (2d Cir. 2018); *see* 15 U.S.C. §§ 77z–2(b)(2)(D), 78u–5(b)(2)(D). Together, they protect all of Nano's forward-looking statements alleged in the SAC.

Under the bespeaks caution doctrine, "[c]ertain alleged misrepresentations ... are immaterial as a matter of law because it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language." *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002). "When read in their entirety," as they must be, "these [disclaimers] not only bespeak caution, they shout it from the rooftops, so to speak." *Id.* at 360. Nano's disclosures shouted the risks to investors, and they cannot close their ears to them. *In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013) ("[T]he prospectuses are not required to address [reasonable investors] as if they were children in kindergarten.").

On March 19, 2024, two months before the IPO, Nano filed its first set of disclosures in connection with its IPO in a Form S-1. Ex. 1. The center of the first page contained a bold disclaimer:

> **Investing in our common stock is speculative and involves a high degree of risk. Before making any investment decision, you should carefully review and consider all the information in this prospectus, including the risks and uncertainties described under "Risk Factors" beginning on page 12.**

*Id.* at 3. Up front, Nano provided investors with a 28-point "Summary of Significant Risks," including the unproven nature of its business and technology models, the necessity to raise substantial amounts of capital, the fact that management had obligations with and would allocate their time to other companies, and the possibility that Nano might not achieve its planned production and commercialization schedule. *Id.* at 17–19. Then, in a clearly marked section titled "Risk Factors," Nano's S-1 spent eighteen (18) pages repeatedly highlighting the inherent difficulty of evaluating its business plans and estimating timelines:

> ***We are an early-stage company in an emerging market with an unproven business model, a new and unproven technology model, and a short operating history, which makes it difficult to evaluate our current business and prospects and may increase the risk of your investment.***

*Id*. at 27 (emphasis in original). With specific regard to its estimated timelines for its nuclear

reactors (*i.e.*, estimated commercialization by 2031), Nano emphasized:

> Notwithstanding the foregoing, these outlined expenditures and **the timelines are estimations only and are inherently subject to change due to certain factors, including adjustments in the microreactor development plan and uncertainties associated with the licensing approval process**. Given that these elements may exceed our initial expectations or lie beyond our control, **we cannot guarantee the accuracy of the actual expenditures and timelines.**
>            ***
> Obtaining the necessary permits and licenses can be a lengthy and complex process, subject to rigorous safety and environmental regulations. **Delays or denials in obtaining these approvals can significantly impact a project's timeline and cost**.

*Id*. at 27-28 (emphasis added). Nano similarly cautioned investors that its planned fuel

fabrication facility also faced regulatory hurdles and potential delays:

> Obtaining the necessary licenses and permits from regulatory authorities can be a complex and time-consuming process. Compliance with stringent safety, security, and environmental regulations is crucial.
>            ***
> Construction delays, regulatory approvals, and unforeseen technical challenges **can extend the timeline for facility development**, potentially affecting market entry and revenue generation.

*Id*. at 31(emphasis added).[11]

      Before she bought her first share of stock, Plaintiff knew the risks associated with Nano's

estimated timelines for reactor commercialization, yet, these timelines form the core of her case.

*Halperin*, 295 F.3d at 357 (no reasonable investor would consider the statements important in

light of the cautionary language).

      The PSLRA safe harbor also protects forward-looking statements made after the IPO. A

forward-looking statement under the PSLRA includes: "statement[s] of the plans and objectives

of management for future operations" and "statement[s] of future economic performance."

---

[11] These disclosures and risks were repeated in Nano's subsequent public filings. Ex. 7 at 23 (March 10-Q); Ex. 8 at 10 & 31 (July 424B4 Prospectus); Ex. 9 at 26 (August 10-Q); Ex. 10 at 9 (October 424B4); Ex. 11 at 36 (2024 10-K), Ex. 15 (May 13, 2024 press release).

15 U.S.C. § 78u-5(i)(1)(B-C). There is no liability if (1) "the forward-looking statement is identified and accompanied by meaningful cautionary language," or (2) the forward-looking statement "is immaterial," or (3) "the plaintiff fails to prove that [the forward-looking statement] was made with actual knowledge that it was false or misleading." *Slayton*, 604 F.3d at 766 (citing 15 U.S.C. § 78u–5(c)(1)). "Because '[t]he safe harbor is written in the disjunctive,' a forward-looking statement is protected under the safe harbor if any of the three prongs applies." *In re Vivendi S.A. Sec. Litig.*, 838 F.3d 223, 245-46 (2d Cir. 2016) (alteration in original) (citation omitted). The combination of the bespeaks caution doctrine and the PSLRA's safe harbor protect almost all of Nano's statements in the SAC. ¶¶143–50, 155–64, 169–77, 180–89, 194–95. The remaining statements are non-actionable puffery and opinion.

### C.    Statements of Puffery and Opinion Are Not Actionable

Puffery and opinions cannot support a claim under Section 10(b). *See Leadersel Innotech ESG v. Teladoc Health, Inc.*, No. 23-1112-CV, 2024 WL 4274362, at *2 (2d Cir. Sept. 24, 2024).

Puffery "often manifests as 'exaggeration[s] or overstatement[s]' that mention 'nothing specific,' but rather amount to 'general claim[s] of superiority' 'expressed in broad, vague, and commendatory language' that are 'considered to be offered and understood as an expression of the seller's opinion only.'" *MacNaughton v. Young Living Essential Oils, LC*, 67 F.4th 89, 96 (2d Cir. 2023) (citing *International Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46, 59–60 (2nd Cir. 2022)).

"A reasonable person understands, and takes into account, the difference … between a statement of fact and one of opinion. She recognizes the import of words like 'I think' or 'I believe,' and grasps that they convey some lack of certainty as to the statement's content."

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 187 (2015).

"[E]xpressions of optimism [and] projections about the future" are quintessential opinion

statements. *In re Int'l Bus. Machs. Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998). Pertinent

here, estimates constitute a well-established species of opinion. *See*, *e.g.*, *Fait v. Regions Fin.

Corp.*, 655 F.3d 105, 110, 111 (2d Cir. 2011), *abrogated on other grounds by Omnicare*, 575

U.S. 175, *as recognized in Abramson v. Newlink Genetics Corp.*, 965 F.3d 165 (2d Cir. 2020).

### 1.    *Nano's "World Class" Team*

Twenty-one (21) times in the SAC, Plaintiff cries fraud due to Nano's use of the phrase

"world class."[12] According to Plaintiff, part-time contractors cannot be considered "world class,"

*ergo*, fraud. Setting aside Plaintiff's unknown source for this definition, this Circuit has found

"world class" to constitute non-actionable puffery. *In re Philip Morris Int'l Inc. Sec. Litig.*, 437

F. Supp. 3d 329, 350 (S.D.N.Y. 2020), *aff'd sub nom. In Re Philip Morris Int'l Inc. Sec. Litig.*,

89 F.4th 408, 417 (2d Cir. 2023) (affirming dismissal and agreeing with district court's

conclusion that statements describing company's scientists as "expert" and "world-class" were

puffery).

### 2.    *Nano's Estimated Timelines*

Depending on which part of the pleading one reads, Nano's estimated timelines to

commercialization are "wildly optimistic" (¶17), "unrealistic" (¶173), "impossible" (¶142), or a

host of other euphemisms borrowed from a short-seller playbook. Before analyzing a

shareholder's legal burden when attacking estimates, defendants urge a reality check.  Plaintiff is

not alleging Nano defaulted on a current obligation and covered it up.  Instead, her claim is more

---

[12] *See* ¶¶ 9, 17, 44, 97–110, 139–40, 157–59, 165, 167–68, 178–79, 232.

attenuated, that outsiders believe Nano will not meet its estimates years in the future.  Rather than wait and see, Plaintiff elects to sue now and takes on an incredibly heavy burden.

Plaintiff must establish at the pleading stage that Nano's estimates were "both objectively false and disbelieved by the defendant at the time [they were] expressed." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) citing *Fait*, 655 F.3d at 110. Statements of future performance are actionable only "if they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them." *Id*.

Plaintiff alleges no facts to meet this burden, and instead plays fast and loose with Nano's public statements, turning estimates and intentions into guarantees by selectively editing quotes. For example, Plaintiff asserts Nano stated it "**would** have" fuel fabrication facilities near the INL by 2027 (¶69), "**would** commercially launch" at least one reactor by 2030-31 (¶62), and "**would** 'develop and submit'" an optional Regulatory Engagement Plan to the NRC in Q4 of 2024 (¶74). (emphasis added). *See* ¶¶163, 176 (alleging Nano repeated these estimates in media interviews). The word "would" does not appear in these disclosures.

Nano's public disclosures contain no guarantees. Nano actually stated its "**hope**" to have its fuel fabrication facility in operation as soon as 2027 (¶147), its "**estimate**" that its microreactors will be launched between 2030 and 2031 (¶169), and that it "**intends**" to develop and submit an optional Regulatory Engagement Plan to the NRC in Q4 of 2024 (Ex. 13 at 2). (emphasis added).

Nano provided investors with its future plans and with estimates for when it hoped to achieve them. Nano acknowledged the many potential factors making its timelines difficult to

predict and disclosed that its timeline estimates were inherently subject to change. *See* Ex. 1 at 27-28; Ex. 7 at 23. Nano made no guarantees.

Finally, the Court should not countenance the speculative opinions of outsiders claiming to look into defendants' minds and know the veracity of their opinions. ¶77. *See Lululemon*, 14 F. Supp. 3d at 581–82 (granting motion to dismiss and finding allegations based on industry expert's opinion did not meet plaintiffs' burden to show falsity). That different people with different perspectives come to varied estimates underscores how subjective factors can lead to different approaches and opinions. *Fait*, 655 F.3d at 111.

## II.    PLAINTIFF FAILS TO ALLEGE A STRONG INFERENCE OF SCIENTER

Even if Plaintiff alleged a misstatement or omission, which she has not, the SAC does not adequately allege scienter – an "intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007). The PSLRA requires Plaintiff to "state with particularity facts giving rise to a strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2)(A). That inference "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (citing *Tellabs*, 551 U.S. at 310). This standard requires the Court to "engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged." *Tellabs*, 551 U.S. at 314. If a "plausible, nonculpable explanation[]" is more likely than fraud, then Plaintiff has failed to plead scienter. *Id.* at 324.

In this Circuit, Plaintiff may plead scienter in one of two ways: "by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA*, 553 F.3d at 198. "In a

case involving multiple defendants, plaintiffs must plead circumstances providing a factual basis for scienter for each defendant; guilt by association is impermissible." *Venkataraman v. Kandi Techs. Grp., Inc.*, No. 20 CIV. 8082 (LGS), 2021 WL 4952260, at *3 (S.D.N.Y. Oct. 25, 2021) (citation omitted). Plaintiff fails to plead scienter under either method.

### A.    Plaintiff Fails to Plead Scienter Based on Motive and Opportunity

To plead scienter based on motive and opportunity, Plaintiff must allege specific facts indicating that each defendant "benefitted in some concrete and personal way from the purported fraud." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 586 (S.D.N.Y. 2011) (quoting *ECA*, 553 F.3d at 198). Motives "generally possessed by most corporate directors and officers do not suffice." *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) (citing *Novak v. Kasaks*, 216 F.3d 300, 312 (2d Cir. 2000)). The mere signing of public filings cannot raise an inference of fraudulent intent. *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 615 (S.D.N.Y. 2015).

### 1.    *Compensation and Stock Ownership*

Without expressly mentioning motive, Plaintiff indirectly advances the proposition that defendants' compensation and stock ownership is evidence of scienter. ¶¶228–29. An alleged desire to maintain a high stock price to increase officer compensation is insufficient to plead scienter in this Circuit. *ECA*, 553 F.3d at 198; *Saskatchewan Healthcare Employee's Pension Plan v. KE Holdings Inc.*, 718 F. Supp. 3d 344, 390 (S.D.N.Y. 2024); *Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 213 (S.D.N.Y. 2020). Pertinent here, no insider stock sales are alleged to have occurred. Plaintiff also does not allege that any defendant's compensation was dependent on or tied in any way to any of the alleged misrepresentations.

18

### 2.    *Unrelated Transactions*

Plaintiff alleges the terms of an office lease in New York entered into years before the IPO, the purchase of an office building in Tennessee, and an association with a nuclear fuel technology company after the end of the putative class period, are evidence of scienter. ¶230. Plaintiff does not explain her reasoning. All of these transactions were disclosed in Nano's public filings and, despite trash talk, Plaintiff has not seriously challenged any of them. Ex. 1 at 96 (New York leases) & Ex. 10 at 13 (nuclear fuel technology company & Tennessee office building). As with defendants' compensation, none of these transactions contribute to an inference of scienter, even if they had occurred within the putative class period, because none relate to any of the alleged misrepresentations in this case.

For the record, the Court should note that Plaintiff mischaracterizes Nano's real estate transactions. For the office leases, Plaintiff erroneously says that Nano paid Mr. Yu $10,000 per month for a "short-term lease." ¶230. First, as Nano disclosed in its IPO prospectus, Nano leased space from Flewber Global, Inc. ("Flewber"), not from Mr. Yu. Ex. 1 at 96. Second, Nano's lease began in 2021, two-and-a-half years before its IPO. *Id.* Third, shortly after the IPO, Nano moved into a larger space and the two leases overlapped for only three months, giving Nano time to move. *Id.* There was not, as Plaintiff intimates, a new lease with Flewber executed in 2024. ¶230. Plaintiff does not explain how this transaction relates to this case.

With respect to the real estate purchase, Nano disclosed in its public filings that it bought a building in Tennessee, in August 2024, after the end of the putative class period, which it is developing as its Nuclear Technology Headquarters. Ex. 10 at 13. As with the New York office leases, Plaintiff vaguely questions the business justification for the transaction, ¶230, but it cannot support an inference of scienter because (1) Plaintiff does not allege a personal benefit to

any defendant, (2) this transaction falls outside the putative class period, and (3) the transaction is not related to any of the alleged misrepresentations.

Plaintiff makes an oblique reference to Nano's investment in and strategic partnership with LIS Technologies, Inc. ("LIST"), a nuclear fuel technology company, and claims this evidences scienter because they were not disclosed. ¶230. Plaintiff misstates the record once again. Nano disclosed all of the details of these transactions in its October 2024 Prospectus (Ex. 10 at 13), pursuant to Regulation S-K, Item 404, 17 C.F.R. § 229.404. Plaintiff does not explain how these post-putative class period transactions with LIST relate to this case.

## B.      Plaintiff Fails to Plead Scienter Based on Conscious Misbehavior or Recklessness

To plead scienter based on conscious misbehavior or recklessness, Plaintiff must allege with detail "that [1] *specific* contradictory information was available to the defendants [2] *at the same time* they made their misleading statements." *In re PXRE Grp., Ltd. Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009) (emphases in original). Conscious misbehavior or recklessness is "a state of mind approximating actual intent, and not merely a heightened form of negligence." *Novak*, 216 F.3d at 312 (quotation omitted).  None of her allegations, individually or collectively, meet Plaintiff's stringent pleading burden.

### 1.      The "Core Operations" Doctrine

Contradicting her own allegations about defendants' divided focus (¶¶98, 141–42, 180–81), Plaintiff pivots to allege scienter is supported by defendants' "laser-focus[] on the development of, and impediment to successfully commercializing their microreactors by 2030 and operating a fuel fabrication facility by 2027." ¶225. While this allegation is incredibly obtuse, it appears Plaintiff is attempting to invoke the "core operations" doctrine, which has been rejected by district courts in this Circuit after the enactment of the PSLRA in 1995. *Glantz v.*

*James River Grp. Holdings, Ltd.*, No. 23-CV-10000 (LJL), 2025 WL 278440, at *8 (S.D.N.Y. Jan. 23, 2025) (citation omitted). "[T]he overwhelming consensus in this district is that such 'core operations' allegations are insufficient—standing alone—to establish scienter." *Gagnon v. Alkermes PLC*, 368 F. Supp. 3d 750, 775 (S.D.N.Y. 2019).

Even if the core operations doctrine were viable, Plaintiff's reliance on it fails because she "has not adequately alleged that there was information pertaining to the core operations of [the company] that *contradicted* Defendants' statements." *Hawes v. Argo Blockchain plc*, No. 23-CV-7305 (CM), 2024 WL 4451967, at *19 (S.D.N.Y. Oct. 9, 2024) (emphasis in original). Plaintiff has not alleged that any defendant possessed contradictory facts making Nano's estimated development timelines unattainable, as opposed to the subjective opinions of outsiders.

### 2.    *Expertise*

Plaintiff alleges that defendants "knew or should have known" Nano's development timeline "had no reasonable basis" because "[d]efendants acknowledged their familiarity with relevant regulations." ¶¶75, 226 (defendants "had knowledge of the attendant requirements" for obtaining NRC approval because they "reported on the regulatory framework (including pending regulations) relevant to obtaining approval…"). Plaintiff does not cite any regulation(s) that make Nano's estimates unobtainable.

Abandoning her earlier attack on management's lack of nuclear experience (¶9), Plaintiff now alleges that "[d]efendant Walker … has substantial experience in the development of nuclear technologies and thus knew, or should have known, that obtaining NRC approval is capital intensive and involves multiple steps that span many years" (¶75). This allegation does not support an inference of scienter because it does not undermine any of the Nano's public statements. Moreover, "[a]llegations of a defendant's experience and expertise also are insufficient to raise an inference of scienter." *Abely v. Aeterna Zentaris Inc.*, No. 12 CIV. 4711

PKC, 2013 WL 2399869, at *18 (S.D.N.Y. May 29, 2013). In fact, Nano disclosed that NRC approval is capital intensive and would span many years. Ex. 1 at 16. Nano also expressly disclosed that uncertainties with the licensing approval process made its commercialization timeline difficult to estimate and inherently subject to change. *Id*. at 27-28.

In the same vein, Plaintiff cannot rely on the opinions of nuclear critics and competitors to establish scienter in the absence of allegations defendants ever met them or were aware of their opinions. *See Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.*, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010) (remarking that "Plaintiffs should, but do not, provide specific instances in which Defendants received information that was contrary to their public declarations"). Plaintiffs must "show that [the] individual defendants actually possessed the knowledge highlighting the falsity of public statements; [and] conclusory statements that defendants were aware of certain information, [or] that defendants would have or should have had such knowledge [,] is insufficient. *Patel v. Koninklijke Philips N.V.*, No. 21-CV-4606 (ERK), 2024 WL 4265758, at *7 n.4 (E.D.N.Y. Sept. 23, 2024). Plaintiff must, but does not, allege facts to establish objective falsity and that a defendant disbelieved his own statements at the time spoken. *Lululemon*, 14 F. Supp. 3d at 571.

### 3.    *Plaintiff's Confidential Witness*

Plaintiff says her confidential witness allegations support scienter, because CW1 supposedly expressed his opinion to Mr. Yu that one of Nano's estimated timelines was "unrealistic." ¶¶64, 231 (addressing the 2030-2031 timeline only). Defendants initially note the phrase attributed to CW1 is the same phrase used by one of Plaintiff's nuclear critics. *Compare* ¶64, *with* ¶¶89, 173, 186. "[C]onfidential sources cannot be used to 'merely parrot … conclusory allegations contained in the complaint.'" *Glaser*, 772 F. Supp. 2d at 590 (citing *In re Sierra Wireless, Inc. Sec. Litig.,* 482 F. Supp. 2d 365, 376 (S.D.N.Y.2007)).

The statements attributed to CW1 do not support scienter. First, there is no basis to believe CW1 would know whether Nano's projected development timelines were achievable. Regardless of titles, CW1 was a grant writer, hired to write government grant applications and research government funding policies. ¶31. Plaintiff does not allege that CW1 ever worked or communicated with the NRC, possessed experience and expertise in the regulatory approval process, or otherwise provide a factual predicate to establish that he would be qualified to opine on Nano's projected timelines. Nano has many nuclear experts and advisors on its team, each of whom has superior foundational knowledge to advise Nano regarding its timeline to commercialization. ¶108(a)–(l). Even assuming CW1 voiced his thoughts to Mr. Yu, his lay opinion does not cast doubt on the *bona fides* of Nano's projections. *See Francisco*, 481 F. Supp. 3d at 208 (citing *Kalnit*, 264 F.3d at 142) (discounting the generalized opinions and beliefs of confidential witnesses as speculative and conclusory).

Second, Plaintiff's allegations lack the necessary specificity to support an inference of scienter based on a confidential witness. To meet her burden, Plaintiff must allege the *specific information* provided to the speaker contradicting his public statement, and identifying *when* the information was provided. *Loc. No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Exp. Co.*, 724 F. Supp. 2d 447, 461 (S.D.N.Y. 2010) *aff'd sub nom.*, 430 F. App'x 63 (2d Cir. 2011). Here, all Plaintiff alleges is that, at some unspecified point in time during CW1's 17-month tenure with Nano that ended months before the IPO, he supposedly shared his opinion with Mr. Yu. ¶¶64, 231. Plaintiff does not identify a single internal document corroborating CW1's view, and the failure to identify the facts and assumptions underlying his opinion is fatal. *See In re Ferrellgas Partners, L.P., Sec. Litig.*, No. 16 CIV. 7840, 2018 WL 2081859, at *19 (S.D.N.Y. Mar. 30, 2018) (Plaintiffs must show "specific instances in which Defendants received

information that was contrary to their public declarations.") (citation omitted), *aff'd*, 764 F. App'x 127 (2d Cir. 2019). Plaintiff's allegations are far too vague to meaningfully contribute to scienter. *See In re Doral Fin. Corp. Sec. Litig.*, 563 F. Supp. 2d 461, 466 (S.D.N.Y.2008).

Third, CW1 left Nano three months before Nano's IPO and before the alleged misrepresentations about the 2030-31 development timelines for reactor commercialization. The lapse of time between CW1's employment and these alleged misrepresentations renders CW1's purported statements to Mr. Yu stale.[13] *See Malin v. XL Cap. Ltd.*, 499 F. Supp. 2d 117, 141 (D. Conn. 2007) (confidential witness allegations insufficient to support scienter where "the bulk of the information relayed by the CWs relates to the time prior to the start of the Class Period"), *aff'd*, 312 F. App'x 400 (2d Cir. 2009). *See also Francisco*, 481 F. Supp. 3d at 208 ("[C]ourts have rejected confidential witness allegations where the confidential witnesses 'left the company before the class period.'") citing *Campo v. Sears Holding Corp.*, 635 F. Supp. 2d 323, 335 (S.D.N.Y. 2009), *aff'd*, 371 F. App'x 212 (2d Cir. 2010).

### 4.    *Part-time Employment Status*

Plaintiff suggests that part-time employment leads to fraud. *See, e.g.*, ¶¶78, 97, 108, 232. This makes no sense and cannot support scienter because none of the alleged misrepresentations are related to, let alone contradicted by, the fact that Nano's technical and science team were employed outside of Nano. Nano disclosed that its ability to develop its plans is highly dependent on raising additional capital and hiring other highly skilled personnel, "including

---

[13] Plaintiff's own allegations demonstrate how the passage of time put CW1 out of touch with Nano. CW1 supposedly says Nano had no one handling regulatory issues (¶63), but the SAC acknowledges that Nano has a Director of Microreactor Regulatory Licensing, Eric Oesterle. ¶108(e). Similarly, the SAC repeats CW1's claim that Nano is waiting until 2027 to start regulatory procedures under 10 CFR Part 53. ¶¶63, 67, 79, 144, 164, 170, 177, 183, 185. Not only is this allegation from CW1 completely uncorroborated, it is also irrelevant because Nano has never stated that it intends to proceed under Part 53.

engineers, nuclear energy professionals, finance, marketing and sales personnel." Ex. 1 at 43.

Nano also disclosed that it would be essential to have a diverse team of skilled professionals, and

its "goal is to build a well-rounded and experienced team with expertise in these areas to ensure

the development, operation, and commercialization of [Nano's] business…." *Id.*

## III.    PLAINTIFF FAILS TO PLEAD LOSS CAUSATION

To state a Section 10(b) claim, Plaintiff must plead loss causation, *i.e.*, a direct causal

connection between the alleged misstatements and damages. *Dura Pharms., Inc. v. Broudo*, 544

U.S. 336, 342, 347 (2005). To do so, Plaintiff must allege either (a) "the existence of cause-in-

fact on the ground that the market reacted negatively to a corrective disclosure of the fraud" or

(b) "the loss was foreseeable and caused by the materialization of the risk concealed by the

fraudulent statement." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227,

232–33 (2d Cir. 2014) (internal citation and quotation marks omitted).

"Under either theory, Plaintiffs must show that the disclosure of information

'concealed ... from the market ... negatively affected the value of the security.'" *DoubleLine Cap.*

*LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 456 (S.D.N.Y. 2018) (quoting *Lentell v. Merrill*

*Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005)). That is, when a complaint alleges that

misstatements and omissions were exposed by a corrective disclosure, "a plaintiff must point to a

statement that, because it corrected a prior falsehood, precipitated a change in the security's price

causing his loss." *DoubleLine*, 323 F. Supp. 3d at 456; *see also In re Omnicom Grp., Inc. Sec.*

*Litig.*, 597 F.3d 501, 511 (2d Cir. 2014) (for a disclosure to be "corrective," it must "reveal some

then-undisclosed facts with regard to the specific misrepresentations alleged in the complaint").

Here, Plaintiff alleges there were three corrective disclosures which caused Nano's stock

price to decline. *See* ¶¶216–17 (Hunterbrook), 220 (Benzinga), 222 (Barron's). Causation fails

for two principal reasons. One, none of these supposed corrective disclosures revealed new

information. Two, Plaintiff alleges these stock drops were attributed to the articles and the opinions of their authors, not to defendants. ¶¶14–16, 120–21.

###    A.    The Hunterbrook Article

Plaintiff's first supposed corrective disclosure is an article published by a short seller, Hunterbrook, on July 19, 2024.[14] ¶¶215–16. Plaintiff says the Hunterbrook article revealed (1) that Nano's progress toward regulatory approval for Nano's microreactor designs and fuel fabrication facilities was "wildly overstated" and (2) that Nano's executive leadership and employees with nuclear experience are part-time employees. ¶215. Plaintiff omits reference to this article's disclaimer that it does not contain material non-public information. *See* Ex. 12 at 2 (stating Hunterbrook Capital has taken a short position), 16 (stating Hunterbrook Capital may take a short position when articles do not include material not public information).

In this Circuit, a "negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the journalists' opinions." *Omnicom*, 597 F.3d at 512. This Circuit routinely rejects claims of loss causation based on short-seller reports that contain negative commentary and opinion based on public information. *See In re EHang Holdings Ltd. Sec. Litig.*, 646 F. Supp. 3d 443, 465–66 (S.D.N.Y. 2022); *In re Ideanomics, Inc. Sec. Litig.*, No. 20-CV-4944, 2022 WL 784812, at *11 (S.D.N.Y. Mar. 15, 2022); *In re MINISO Grp. Holding Ltd. Sec. Litig.*, No. 22-CV-9864 (ER), 2024 WL 759246, at *20 (S.D.N.Y. Feb. 23, 2024).

The Hunterbrook article was based entirely on publicly available information and reflected only the opinions of Hunterbrook. Ex. 12 at 16. A short seller's published opinion may

---

[14] In the distinction-without-a-difference department, no legal relevance attaches to the fact that Hunterbrook Media published the article in question and its affiliate hedge fund, Hunterbrook Capital, is the one who actually shorted Nano's stock. *See* ¶215 n.64.

move a company's stock price, but, absent a revelation of previously undisclosed facts, it does

not constitute a corrective disclosure and cannot support loss causation.[15] While Plaintiff asserts

the Hunterbrook article revealed that Nano's development progress was overstated (¶215), in

truth, the Hunterbrook article merely used publicly available data to voice a negative opinion

about Nano's ability to achieve its development goals (Ex. 12).

Similarly, Plaintiff's assertion that the Hunterbrook article revealed that Nano's

executives and other employees were employed on a part-time basis is simply false. From the

beginning, Nano disclosed that it had no full-time employees, that its employees largely worked

remotely, that none of defendants were retained on a full-time basis, and that all of defendants

had obligations at other companies which could divert their attention away from Nano. Ex. 1 at

36, 94-96. "[T]here can be no omission where the allegedly omitted facts are disclosed." *City of

Omaha Police*, 450 F. Supp. 3d at 409 (citing *In re Progress Energy, Inc*., 371 F. Supp. 2d 548,

552 (S.D.N.Y. 2005)). The Hunterbrook article did not reveal anything new about Nano's

development progress. Nor did it correct any of Nano's prior public disclosures.

Hunterbrook intended to drive down Nano's stock price and, having accomplished its

objective (¶216), the chain of causation is broken and defendants cannot be held responsible for

the temporary downturn. *Elkind v. Liggett & Myers, Inc*., 635 F.2d 156, 163 (2d Cir.1980).

### B.     The Benzinga Article

Plaintiff's second supposed corrective disclosure is an interview published in Benzinga

on July 23 in which Messrs. Yu and Walker disputed the accuracy of the Hunterbrook article and

---

[15] It is unfortunate, but not uncommon, for articles styled as "reports" to be issued by short sellers to increase volatility and depress a company's stock price. *See In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1178 n.3 (9th Cir. 2024), (quoting Barbara A. Bliss, Peter Molk, Frank Partnoy, *Negative Activism*, 97 Wash. U.L. Rev. 1333, 1348  (2020)).

challenged the conclusions of the anti-nuclear commentators quoted within. ¶¶218–19. Plaintiff

does not allege any new information was revealed, asserting only her personal opinion that the

market was "unpersua[ded]" by Nano's executives' responses to the Hunterbrook article. ¶223.

The Benzinga article is not alleged to have revealed the falsity of a prior misrepresentation, and,

therefore, cannot serve as a causal connection between the alleged misstatements and the losses

allegedly incurred. *City of Omaha Police*, 450 F. Supp. 3d at 409.

### C.    The Barron's Article

Plaintiff's last supposed corrective disclosure is the publication of an article on July 31

(after the putative class period) in which Barron's principally reported on Gov. Cuomo joining

Nano as an advisor, the earlier Hunterbrook article, and observed that Nano's public filings

showed that Nano had no full-time employees, had not yet acquired patents, and had not yet built

a nuclear reactor. ¶¶221–22. Here, too, no corrective disclosure is alleged because the Barron's

article simply reprinted information previously disclosed in Nano's public filings and repeated

Hunterbrook's negative commentary. As with the Hunterbrook article, a "journalistic

characterization" of public information does not constitute a corrective disclosure of anything

other than the journalist's opinions, and does not support loss causation as a matter of law. *See

Omnicom*, 597 F.3d at 512. Moreover, authors unaffiliated with Nano who allegedly cause a

stock drop bear the responsibility, not Nano. *Elkind*, 635 F.2d at 163.

## IV.    PLAINTIFF'S SECTION 20(a) COUNT FAILS TO STATE A CLAIM

To plead a claim under Section 20(a) of the Exchange Act, Plaintiff must plead a

predicate, primary violation of securities law. *Golla v. Neovasc, Inc.*, No. 22-361-CV, 2023 WL

2469770, at *3 (2d Cir. Mar. 13, 2023); *ATSI*, 493 F.3d at 108. Because Plaintiff has failed to

plead a primary violation of Section 10(b), her Section 20(a) claim must be dismissed. *ATSI*, 493

F.3d at 108.

**CONCLUSION**

After reviewing Nano's business plan and buying into the concept, Plaintiff now wishes Nano to conform to her "experts'" view of the nuclear industry.  If she is second-guessing her investment, despite Nano's achievements, then she is free to sell her stock at a profit and invest her proceeds elsewhere.  There are no misstatements, there are no omissions, there is no fraud. Nano is simply doing what it planned to do, in the manner it said it would do it. Defendants request the Court dismiss the SAC with prejudice.

Date: April 11, 2025                              Respectfully submitted,


                                    _____/s/ Eric Landau_____
                                    Eric Landau (EL1420)
                                    Travis S. Biffar (*admitted pro hac vice*)
                                    ELLENOFF GROSSMAN & SCHOLE LLP
                                    949 South Coast Drive, Suite 200
                                    Costa Mesa, CA 92626
                                    *elandau@egsllp.com*
                                    *tbiffar@egsllp.com*
                                    (949) 416-3102 (direct) / (949) 416-0250 (fax)
                                    *Attorneys for defendants*

The undersigned, counsel of record for defendants, certifies that this brief contains 8,706 words, as reported by the word processing program used to prepare this document, which complies with the word limit of L.R. 7.1(c).

Date: April 11, 2025

_____/s/ Eric Landau_____

Eric Landau (EL1420)
Travis S. Biffar (*admitted pro hac vice*)
ELLENOFF GROSSMAN & SCHOLE LLP
949 South Coast Drive, Suite 200
Costa Mesa, CA 92626
*elandau@egsllp.com*
*tbiffar@egsllp.com*
(949) 416-3102 (direct) / (949) 416-0250 (fax)
