## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HONGYU XIE, individually and on behalf of all others similarly situated, <br><br>                 Plaintiff, <br><br><br>      v. <br><br><br> NANO NUCLEAR ENERGY INC., JAY YU, JAMES WALKER, and JAISUN GARCHA | Case No. 24-cv-6057 (JMF) |

## LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ................................................................................................ 1

II.    STATEMENT OF FACTS .................................................................................................... 2

   A.    The Rigorous and Lengthy Regulatory Approval Process ..................................... 2

   B.    Defendants Touted Unachievable Commercialization Timelines ........................ 3

   C.    NNE's Mythical "World-Class" Teams and Inexperienced Boards .................... 5

   D.    Defendants' Materially False and Misleading Statements.................................... 5

   E.    The Truth Emerges ................................................................................................ 6

   F.    Post-Class Period Events ....................................................................................... 7

III.    ARGUMENT ........................................................................................................................ 8

   A.    Legal Standards...................................................................................................... 8

   B.    The AC Adequately Alleges Falsity ...................................................................... 8

      1)    Defendants Misled Investors Regarding the Commercialization Timeline for NNE's Microreactors ............................................................................................................ 10

      2)    Defendants Misled Investors Regarding the Commercialization Timeline for a Fuel Fabrication Facility ........................................................................................................ 11

      3)    Defendants Misled Investors Regarding NNE's "World Class" Teams...................... 13

      4)    Defendants Misled Investors Regarding the Lack of Government Funding ............... 16

      5)    Defendants Misled Investors Regarding Withum.......................................................... 16

      6)    The Bespeaks Caution Doctrine and PSLRA Safe Harbor Do Not Apply .................. 17

   C.    The AC Adequately Alleges a Compelling Inference of Scienter .................................. 18

      1)    The AC Alleges Conscious Misbehavior or Recklessness ............................................ 19

      2)    The CW and Expert Allegations Support the Scienter Inference ................................. 22

      3)    Defendants' Failure to Dispute the Report Supports the Scienter Inference ............... 24

      4)    The AC Adequately Alleges Motive and Opportunity ................................................. 24

   D.    The AC Adequately Alleges Loss Causation........................................................... 26

   E.    The AC Alleges Control Person Liability.......................................................................... 27

IV.    CONCLUSION.................................................................................................................... 27

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co*.,
    19 F.4th 145 (2d Cir. 2021) ...................................................................................................9

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
    663 F. Supp. 3d 334 (S.D.N.Y. 2023)....................................................................................15

*Blank v. TriPoint Glob. Equities, LLC*,
    338 F. Supp. 3d 194 (S.D.N.Y. 2018)....................................................................................25

*Cornell v. Credit Suisse Grp.*,
    689 F. Supp. 2d 629 (S.D.N.Y. 2010)....................................................................................21

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)................................................................................................................26

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)...................................................................................................24

*Emps' Ret. Sys. of Gov't of the V.I. v. Blanford*,
    794 F.3d 297 (2d Cir. 2015)............................................................................................19, 23

*Francisco v. Abengoa, S.A.*,
    481 F. Supp. 3d 179 (S.D.N.Y. 2020)....................................................................................27

*Frankfurt-Tr. Inv. Lux. AG v. United Techs. Corp.*,
    336 F. Supp. 3d 196 (S.D.N.Y. 2018)....................................................................................17

*Galestan v. OneMain Holdings, Inc.*,
    348 F. Supp. 3d 282 (S.D.N.Y. 2018)....................................................................................17

*Gentry v. Kaltner*,
    2020 WL 1467358 (S.D.N.Y. Mar. 25, 2020) ..................................................................10, 16

*Guozhang Wang v. Cloopen Grp. Holding Ltd*.,
    661 F. Supp. 3d 208 (S.D.N.Y. 2023) (BCD).......................................................................17

*IEBW Loc. 90 Pension Fund v. Deutsche Bank AG*,
    2013 WL 1223844 (S.D.N.Y. Mar. 27, 2013) .......................................................................26

*In re Aphria Sec. Litig*.,
    2020 WL 5819548 (S.D.N.Y. Sept. 30, 2020) .......................................................................15

*In re Avon Sec. Litig.*,
  2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019)....................................................................15

*In re Barclays Liquidity Cross & High Frequency Trading Litig.*,
  390 F. Supp. 3d 432 (S.D.N.Y. 2019)....................................................................8, 26

*In re Dentsply Sirona, Inc. Sec. Litig.*,
  665 F. Supp. 3d 255 (E.D.N.Y 2023) ....................................................................26

*In re EVCI Colls. Holding Corp. Sec. Litig.*,
  469 F. Supp. 2d 88 (S.D.N.Y. 2006)....................................................................17

*In re GigaCloud Tech. Inc. Sec. Litig.*,
  2025 WL 307378, . (S.D.N.Y. Jan. 27, 2025) ........................................................8, 22, 27

*In re Initial Pub. Offering Sec. Litig.*,
  358 F. Supp. 2d 189 (S.D.N.Y. 2004)....................................................................21

*In re OSI Pharms., Inc. Sec. Litig.*,
  2007 WL 9672541 (E.D.N.Y. Mar. 31, 2007) ........................................................17

*In re Philip Morris Int'l Inc. Sec. Litig.*,
  437 F. Supp. 3d 329 (S.D.N.Y. 2020), *aff'd*, 89 F.4th 408 (2d Cir. 2023)...........................15

*In re Salix Pharms., Ltd.*,
  2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)........................................................18

*In re Signet Jewelers Ltd. Sec. Litig.*,
  2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018)........................................................15

*In re Virtu Fin., Inc. Sec. Litig.*,
  2025 WL 847824 (E.D.N.Y. Mar. 17, 2025)........................................................19

*Karimi v. Deutsche Bank Aktiengesellschaft*,
  607 F. Supp. 3d 381 (S.D.N.Y. 2022)....................................................................14, 17

*Lematta v. Casper Sleep, Inc.*,
  2022 WL 4637795 (E.D.N.Y. Sept. 30, 2022) ........................................................18

*Litwin v. Blackstone Grp., L.P.*,
  634 F.3d 706 (2d Cir. 2011)....................................................................9

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015)....................................................................8

*Lozada v. TaskUs, Inc.*,
  710 F. Supp. 3d 283 (S.D.N.Y. 2024)....................................................................22

*Macquarie Infrastructure Corp. v. Moab Partners, L. P.*,
    601 U.S. 257 (2024)..................................................................................13

*McMahan & Co. v. Wherehouse Ent., Inc.*,
    900 F.2d 576 (2d Cir. 1990).....................................................................10

*Meyer v. Jinkosolar Holdings Co.*,
    761 F.3d 245 (2d Cir. 2014).....................................................................14

*Micholle v. Ophthotech Corp.*,
    2019 WL 4464802 (S.D.N.Y. Sept. 17, 2019)...........................................8

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)................................................................15, 19

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
    367 F. Supp. 3d 16 (S.D.N.Y. 2019)........................................................12

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)...........................................................................13, 15

*Pirnik v. Fiat Chrysler Autos., N.V.*,
    2016 WL 5818590 (S.D.N.Y. Oct. 5, 2016) .............................................20

*Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*,
    2019 WL 2360942 (S.D.N.Y. Mar. 4, 2019) ............................................20

*Ret. Sys. v. Lockheed Martin Corp.*,
    875 F. Supp. 2d 359 (S.D.N.Y. 2012).......................................................20

*Ret. Sys. v. MF Glob., Ltd.*,
    620 F.3d 137 (2d Cir. 2010)......................................................................17

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
    732 F. Supp. 3d 300 (S.D.N.Y. 2024)..................................................24, 25

*Slayton v. Am. Express Co.*,
    604 F.3d 758 (2d Cir. 2010)......................................................................17

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007).............................................................................18, 26

## Rules

Fed. R. Civ. P. 8.........................................................................................26

Fed. R. Civ. P. 9...........................................................................................8

**Other Authorities**

10 CFR Part 50.............................................................................................................2

10 CFR Part 52.........................................................................................................2, 10

10 CFR Part 53................................................................................................... *passim*

I.    **PRELIMINARY STATEMENT[1]**

The lack of a statement of facts in Defendants' Motion is no accident. The facts are damning. Throughout the Class Period, Defendants touted that NNE's "world-class" teams could bring nuclear microreactors to market by 2030 and operate a fuel fabrication facility by 2027, feats that – unbeknownst to investors – were belied by the extremely lengthy regulatory processes that NNE had yet to begin, NNE's lack of funding, and the fact that NNE did not have a single non-administrative full-time employee. In addition to touting these unachievable timelines, Defendants described purported developments efforts they had undertaken, without revealing that they held no regulatory significance, claimed that NNE's lack of government funding gave it an advantage over competitors, though they in fact needed government funding desperately, touted their "world-class" management team, though neither the CEO nor CFO have any background in the nuclear industry and simultaneously led other floundering penny stocks, touted their "world-class" scientific and technical teams though none worked for NNE full-time and most held full-time employment elsewhere, and touted their "expert" auditor without revealing the auditor had been sanctioned by the Public Company Accounting Oversight Board ("PCAOB") three months prior.

The aforementioned facts are *undisputed* and Defendants do not disclaim contemporaneous knowledge of a single one. Instead, Defendants argue that they "told investors what it planned to do and warned investors of the risks." Mot. at 1. Relaying plans to investors may not violate the federal securities laws, but relaying plans they know are unachievable along with hypothetical risks that have already materialized does. Investors learned the truth in the Hunterbrook Report,

---

[1] References to "¶_" are to paragraphs of the Second Amended Class Action Complaint for Violation of the Federal Securities Laws ("AC")( ECF No. 59). Capitalized terms not defined herein have the meanings assigned to them in the AC. References to "Motion" or "Mot." are to Defendants' Memorandum of Law in Support of their Motion to Dismiss the AC (ECF No. 61). All emphasis is added, and internal quotation marks and citations are omitted unless otherwise indicated.

which Defendants failed to dispute in a subsequent interview with Benzinga. Two more journalists conducted their own investigations thereafter, *and came to the same conclusions as Hunterbrook*. The allegations are further corroborated by a former Director of Energy Programs for NNE who worked closely with Defendant Yu, and five separate experts, including two former heads of the Nuclear Regulatory Commission. With each element of the Sections 10(b) and 20(a) claims adequately pled, Defendants' Motion should be denied in its entirety.

## II.    STATEMENT OF FACTS

NNE, a pre-revenue company with no products or patents of its own, purports to have four business lines: (i) microreactors; (ii) fuel fabrication; (iii) fuel transportation; and (iv) consultation services. ¶¶2, 32, 38-42.

### A.  The Rigorous and Lengthy Regulatory Approval Process

Companies developing microreactors must complete a rigorous multi-step regulatory and licensing process through, *inter alia,* the Nuclear Regulatory Commission ("NRC"), which has historically taken *decades* to navigate. ¶¶44-47. Current licensing frameworks are tailored to large, traditional light water reactors, not microreactors which are a relatively new technology. ¶¶45, 50, 63.

The two existing frameworks are 10 CFR Part 50 and 10 CFR Part 52. ¶50. 10 CFR Part 50 provides for a two-step process which can cost billions of dollars and take decades to complete –which has led applicants to abandon their applications due to financial strain. ¶¶51-52, 71, 86, 90-92. 10 CFR Part 52 streamlines the process into one step but can still take over a decade to navigate. ¶¶53, 71. The NRC is also working on a proposed rule for microreactors, 10 CFR Part 53, but will not complete the rulemaking process until the end of 2027. ¶57. Additionally, NNE's former Director of Energy Programs, CW1, explained that even after obtaining approvals, the queue to get a nuclear reactor on an electrical grid will take years. ¶66. Even if NNE intends to

take a "behind the meter" approach (powering a factory or datacenter directly), there is tremendous uncertainty as to the timing for obtaining approval to do so.

### B.  Defendants Touted Unachievable Commercialization Timelines

Throughout the Class Period, Defendants projected that they could commercialize a microreactor **by 2030-2031** but never revealed that they had not yet initiated the regulatory process. ¶¶62, 65. Indeed, according to CW1, Defendants did not intend to start the process until implementation of 10 CFR Part 53 and did not even have a dedicated employee to handle licensing or regulatory issues. ¶¶63, 78-79, 100, 107. Moreover, NNE spent far more on marketing and compensation than on research and development ("R&D"), though they had promised investors they would use the majority of IPO proceeds for R&D. ¶¶3, 35-37, 72-73. CW1 discussed timing concerns with Defendant Yu more than once. ¶¶64-66.

Defendants also told investors that they could have an operational fuel fabrication facility near INL by 2027. ¶67. Indeed, even before the Class Period Defendant Walker stated in a May 2023 interview that required approvals for a plant were "pretty much complete," estimating that construction could possibly start in 2024. *Id*. Yet, the NRC does not list a permit application from NNE. *Id.* Moreover, as CW1 explained, even if NNE managed to construct a plant years from now, it does not have any viable options for purchasing HALEU to fabricate into fuel. ¶68. Only one US company, Centrus Energy Corp., is licensed to enrich uranium up to the levels needed for microreactors. *Id.* To date, NNE (despite a nonbinding nonexclusive MOU) has yet to actually engage in any discussions with Centrus regarding providing HALEU to NNE, Centrus is years away from receiving its own regulatory approvals and upgrading its technology to scale production, NNE does not have government funding or other access to capital to afford purchasing HALEU, and several of its competitors will have priority to purchase from Centrus. ¶¶68, 85.

Industry experts attest that Defendants' commercialization timelines lacked plausibility. ¶¶77-96. Stephen Burns, former NRC chairman, stated that a 2030 commercialization deadline "is far from feasible" because NNE is waiting to begin the process until implementation of 10 CFR Part 53, NNE did not have a single full-time employee dedicated to a regulatory process that needs a team of at least 15 people at the design phase and then 30-50 thereafter, and the NRC website did not list any pre-applications from NNE. ¶¶78-79. Paul Dorfman, a nuclear policy expert, stated that NNE's timelines are "an impossibility," "frankly laughable," "ludicrous," "not doable," and "just cannot happen." ¶80. Allison Macfarlane, another former NRC chair, similarly stated that NNE's commercialization timeline "won't happen" because if NNE had not even begun the approval process, "they are pretty far off" as the NRC licensing process takes years even for well-funded organizations with high-quality employees equipped to handle NRC's inevitable concerns. ¶81. Moreover, Macfarlane estimated it could cost up to a hundred billion dollars to bring a microreactor to commercial readiness. ¶82. Dr. Matthew Memmott, a chemical engineering professor at Brigham Young University, agreed that NNE lacks the personnel and experience to commercialize a microreactor in the next decade given that the process has not begun, because the NRC issues multiple Requests for Additional Information leading to inevitable design changes. ¶86. M.V. Ramana, a global affairs professor and director at the University of British Columbia also stated that even if NNE had billions in cash available, and with "every benefit of the doubt," Defendants' 2030 projection is "completely unrealistic," "completely arbitrary," and "wishful thinking" to attract investors and raise money. ¶89.

Multiple experts stated Defendants' 2027 timeline for fuel fabrication is also a "fantasy" and there are "a lot of reactor designers in front of NNE" for getting fuel from Centrus. ¶¶83, 85. Ramana confirmed that better-capitalized companies who are furthest along in the regulatory

process will get priority for HALEU– not NNE. ¶¶91-92, 94-95. Moreover, while Defendants touted an INL design audit, Memmott confirmed that the audit has no regulatory significance. ¶88.

### C. NNE's Mythical "World-Class" Teams and Inexperienced Boards

Defendants repeatedly touted NNE's "world-class" management, scientific, and technical teams with "extensive experience," though Defendants Yu and Garcha have no nuclear industry experience, *none of the teams work for NNE full-time,* and the management team *simultaneously* led other underperforming (and alleged pump and dump) ventures. ¶¶97, 102-04. Though Defendants acknowledged in SEC filings that they "***may*** allocate their time to other businesses," they characterized the risks from their "divided focus" as hypothetical though they had materialized, ¶98, and omitted that *NNE's scientific and technical teams* actually held full-time positions *elsewhere.* ¶108. Further, none of NNE's "independent directors" have nuclear industry experience, NNE's Board of Executive Advisors includes an aggressive promoter of fraudulent Chinese firms, and NNE utilizes a shady auditor, WithumSmith+Brown ("Withum"), which the PCAOB fined in February 2024. ¶¶105-06, 110.

### D. Defendants' Materially False and Misleading Statements

Throughout the Class Period, Defendants repeatedly falsely assured investors they could *commercialize* a microreactor by 2030-31 and provided investors with the false impression that they were progressing with the regulatory process, though they had not even begun. ¶¶143, 145, 163, 169, 176, 182, 184. Defendants falsely touted NNE's lack of government funding as an advantage, though NNE did not have anywhere near the funds necessary to navigate the regulatory approval process, and falsely stated that most of the IPO proceeds would go toward R&D, though they went toward marketing and compensation. ¶¶149, 159, 175, 188. Defendants also falsely stated they could have a fuel fabrication facility near INL *in operation* by 2027 (¶¶147, 186), touted completion of INL design audits (¶¶171, 173), and touted a MOU with Centrus to provide

HALEU for fuel fabrication[2], though they had not begun the approval process for a fuel fabrication facility, did not have a site near INL, had not undertaken any efforts with regulatory significance, and had no reasonable prospects for obtaining HALEU. ¶¶155, 194.

Moreover, Defendants touted NNE's *"world class"* scientific, technical and management teams with a "deep knowledge of applicable regulatory requirements," though most held full-time employment elsewhere and the management team also ran floundering ventures accused of pump and dump schemes. ¶¶139, 157, 159, 165, 167, 178. Defendants falsely characterized the risk that their own "divided focus" posed to the business as hypothetical, though a nuclear company cannot succeed without a team of full-time experienced employees. ¶¶141, 180. Defendants further touted NNE's "Executive Advisory Board" and "Experts" while omitting their scandalous backgrounds. ¶¶151, 161, 190, 192.

### E.  The Truth Emerges

On July 19, 2024, investigative journalist Hunterbrook Media published a report ("Report") quoting industry experts who called NNE's timeline "frankly laughable;" and said "it won't happen" noting licensing alone could easily take seven years; revealed NNE's top management not only worked part-time for NNE but also simultaneously held executive positions at other penny-stock companies; revealed that the NRC "does not list NNE among the companies that have begun pre-application activities" and NNE appears to have "filed no permitting or regulatory application documents with the NRC;" and noted that the PCAOB sanctioned and fined NNE's auditor $2 million on February 2024 for "taking on hundreds of SPAC clients without necessary resources" to properly monitor them. ¶¶10-13, 115, 196-200.

---

[2] Even pre-Class Period, Defendant Walker claimed that approvals for NNE's designs for a fuel fabrication plant at the INL were "*pretty much complete*" and estimated that construction on the project could possibly start in 2024. ¶¶8, 40, 67, 136.

NNE's stocked declined over 10% in response. ¶¶14, 216. As the market absorbed the revelations, NNE's share price declined another 17% the following business day. ¶¶14, 217.

Then, during an interview with Benzinga after market close on July 23, 2024, Defendants Yu and Walker failed to challenge a single allegation in the Report, instead accusing Hunterbrook of "ulterior motives" and the quoted experts of being "anti-nuclear," *though none of their statements were anti-nuclear*. ¶¶201, 218. Defendant Yu falsely claimed Hunterbrook did not reach out to NNE for comment, a claim Benzinga later debunked. ¶¶201, 219. As a result, NNE's stock dropped 7% the following day. ¶¶202, 220.

On July 31, 2024, Barron's published an article validating the contents of the Report based on its own investigation. ¶¶15, 203, 221. This validation from a reputable journalist caused NNE's stock to drop 7.37% that day and 16.51% the following day. ¶¶16, 204, 222.

### F.   Post-Class Period Events

On August 13, 2024, NNE's counsel issued a demand letter to Hunterbrook ("Demand Letter") to cease and desist publishing information regarding NNE and to "take down the Report," but the Demand Letter *did not dispel a single allegation in the Report*. ¶¶121-22. Though NNE's counsel tried to intimidate Hunterbrook with threats to "pursue all available legal and equitable remedies for the damages incurred," Hunterbrook never retracted the Report and NNE has taken no further action. ¶123.

On October 3, 2024, J Capital Research published a scathing report regarding NNE that corroborated much of the misconduct described herein, in the Report and in the Barron's article, based on its own in-depth investigation. ¶¶126-35, 205-13.

III.    **ARGUMENT**

### A.  Legal Standards

A motion to dismiss tests the legal feasibility of a complaint. *In re Barclays Liquidity Cross & High Frequency Trading Litig.*, 390 F. Supp. 3d 432, 453 (S.D.N.Y. 2019) (Furman, J.). "The test of a claim's substantive merits is reserved" for summary judgment or trial. *Id.* On a motion to dismiss, the Court "must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *In re GigaCloud Tech. Inc. Sec. Litig.*, 2025 WL 307378, at *4. (S.D.N.Y. Jan. 27, 2025) (Furman, J.)

Section 10(b) claims must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Id.* Although Rule 9(b) requires that fraud be alleged with "particularity," the "alleged fraud need only be *plausible*," not "more likely than" alternatives. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 174 (2d Cir. 2015).

### B.  The AC Adequately Alleges Falsity

To plead falsity, plaintiffs must specify the alleged misstatements and explain how they misled investors. *Micholle v. Ophthotech Corp.*, 2019 WL 4464802, at *5 (S.D.N.Y. Sept. 17, 2019). Satisfying this standard, the AC alleges that Defendants falsely stated that: (i) they could *commercialize* a microreactor by 2030-31, though NNE had not yet begun the regulatory approval process for the *design* of a microreactor, did not plan to pursue the regulatory process until implementation of 10 CFR Part 53, did not have any full-time employees dedicated to design, development, or regulatory approval, and did not have sufficient funding; (ii) they could have an *operational* fuel fabrication facility near INL by 2027 and could receive HALEU from Centrus to fabricate fuel, though NNE had not begun the approval process for designing, building or operating

a fuel fabrication facility and had no realistic prospects for obtaining HALEU; (iii) NNE had

"world class" management, technical, and scientific teams, and an expert executive advisory

board, working to accomplish the foregoing, though NNE's management spent most of their time

leading other ventures, lacked a background in nuclear energy (with the exception of Defendant

Walker[3]) and have a troubling penchant for leading underperforming "pump and dump"

operations, NNE's technical/scientific teams are wholly part-time employees with full-time

positions elsewhere, and the executive advisory board includes Wesley Clark, promoter of

fraudulent Chinese companies; (iv) NNE's lack of government funding is an advantage, though

NNE needs government funding and has nowhere near the billions of dollars necessary to marshal

its microreactors and fuel fabrication facility through the lengthy, complex and multi-layered

regulatory approval process for design, construction, *and* commercialization; and (v) NNE's

auditor, Withum, is an "expert," without revealing that the PCAOB sanctioned and fined Withum

$2 million in February 2024.[4]

Moreover, while materiality is fact-intensive and rarely dispositive at the pleading stage,

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co*., 19 F.4th 145, 151 (2d Cir. 2021), it is clear that the

foregoing misstatements and omissions would not have been "so obviously unimportant" to

reasonable NNE investors given that NNE is pre-revenue and the disclosure of the truth would

have significantly altered the total mix of information regarding the plausibility of its timelines

and business strategies. *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 717 (2d Cir. 2011). Falsity

is thus adequately pled.

---

[3] The AC's acknowledgment of this is not "[a]bandoning" allegations that neither Yu nor Garcha have relevant experience. Mot. at 21. Allegations regarding "experience and expertise" are relevant, *cf. id.*, when Defendants make statements that they are "world-class," giving investors the impression that they have relevant experience and expertise, which does not include running other pump and dump companies into the ground.

[4] Defendants accuse Plaintiff of "repackag[ing] the same allegations multiple times." Mot. at 4 n.7. However, Defendants repeated each alleged misstatement "multiple times." The AC recounts each instance and explains how and why Defendants' repeated misstatements misled investors.

1) <u>**Defendants Misled Investors Regarding the Commercialization Timeline for NNE's Microreactors**</u>

Defendants falsely told investors that they could ***commercialize*** at least one of their microreactors by 2030-2031. However, as multiple industry experts[5] *including former NRC heads* attested, that timeline was implausible due to several undisputed facts: (i) NNE had not initiated the pre-application process for even *design* approval of any microreactor under 10 CFR Part 52; (ii) NNE did not plan to start the process until implementation of 10 CFR Part 53, which is not expected until late 2027; (iii) NNE allocated more funding to marketing and compensation than R&D despite promising to use IPO proceeds for R&D, had no government funding and had nowhere near the billions of dollars needed to marshal a microreactor through the regulatory process; and (iv) NNE, led by a part-time CEO with no nuclear experience, did not have *any* full-time employees dedicated to designing, developing, or obtaining regulatory approval. Nevertheless, Defendants consistently represented that they could achieve a 2030-31 timeline. Defendant Walker even went so far as to call the timeline "*conservative*." ¶163.

Moreover, to lend credibility to their timeline, Defendants described development efforts, including "preconceptual design," "design optimization," an INL "design audit"[6], and purported communications with regulators "informing them of the status of our microreactor designs and the estimated internal timelines for our microreactor developments," but never disclosed that these efforts bore no regulatory significance and did not start the clock for regulatory approval of their

---

[5] Tellingly, Defendants do not dispute a single statement attributed to the experts cited in the AC. Instead, they self-servingly opine that they are "anti-nuclear." Mot. at 1, 3, 28. None of the expert *statements* in the AC are anti-nuclear. They explain based on extensive experience and illustrative examples, precisely why Defendants' commercialization timelines are implausible. Regardless, none of the articles Defendants cite is included in their request for judicial notice. ECF No. 62. Indeed, the Court cannot take judicial notice of these articles for the truth of the matters asserted therein. *Gentry v. Kaltner*, 2020 WL 1467358, at *6 (S.D.N.Y. Mar. 25, 2020).

[6] Defendants argue that the AC "does not allege that audits did not occur," Mot. at 11. By touting the audits, Defendants created the impression that NNE had taken steps that rendered their commercialization timelines plausible though they had no regulatory significance. *McMahan & Co. v. Wherehouse Ent., Inc*., 900 F.2d 576, 579 (2d Cir. 1990) (statements are "measured not by literal truth, but by the ability . . . to accurately inform rather than mislead" investors.)

microreactor *designs*, much less approval to *construct* or *commercialize*. The total mix of information Defendants provided thus told investors that NNE could commercialize a microreactor and conceivably start earning revenue therefrom by 2030-31, though the facts in Defendants' possession, enumerated above, belied that possibility.

      2)  **Defendants Misled Investors Regarding the Commercialization Timeline for a Fuel Fabrication Facility**

Assuring investors that NNE could earn revenue *even earlier than 2030*, Defendants falsely stated they could have a fuel fabrication facility *near INL* in operation by 2027. Defendant Yu also emphasized that the "HALEU businesses will be key to producing revenue in the near term." ¶157. To convince investors they could achieve this timeline, Defendants stated that they "have been working with the DOE and INL on our fuel fabrication facility plans" (¶¶147, 186), claimed to have selected a site *near INL*, averred that "initial site preparation and construction work would begin in 2025" (¶122), and touted its MOU with Centrus (¶¶155, 194). However, again, Defendants' timeline had no reasonable basis. Indeed, multiple industry experts stated that a 2027 timeline was a "fantasy," "frankly laughable," "ludicrous," "not doable," and "just cannot happen." *E.g.*, ¶¶80-84.

First, NNE had not even begun the regulatory process, did not have government funding for the costly endeavor, and had at most engaged in informal communications with INL. Indeed, though claiming they could begin construction on a site near INL in 2024, NNE's most recent 10-K ("2024 10-K") tells a different story, stating they have only "tentatively identified the site we intend to construct the facilities and have begun to build the team to design and develop these facilities" and does not mention proximity to INL. ECF No. 63-11 at 3[7].

---

[7] Citations to SEC filings attached to the Motion reference the original page numbers.

Second, even if NNE eventually obtains approvals and constructs a facility, it cannot operate without HALEU. NNE had *no prospects* for obtaining HALEU from Centrus or any other source. Centrus is years away from obtaining approvals, is still upgrading its technology, and does not have funding to scale production. Moreover, multiple experts agreed that several NNE competitors[8] who are better-funded and further along in the regulatory process will receive HALEU from Centrus before NNE if Centrus ever achieves commercialization. Indeed, the 2024 10-K states that NNE and Centrus still have not discussed the *possibility* of Centrus providing HALEU to NNE ("both parties ***will*** explore the possibility of Centrus providing [HALEU to NNE]"), and warns *for the first time* that "[t]here is no assurance that we will enter into any purchase agreement with Centrus in the future." ECF No. 63-11 at 18, 30. The foregoing allegations bely Defendants' argument that "Plaintiff does not explain the significance" of the omitted information regarding Centrus. Mot. at 9. Regardless, this is a materiality argument that is not ripe for resolution at this stage. *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 31 (S.D.N.Y. 2019).

Therefore, NNE's fuel fabrication business cannot produce revenue for NNE in the "near term," and certainly not by 2027.[9] To date, NNE still has not earned a dollar from *any business line.*[10] Defendants bizarrely argue that promising investors they would earn "immediate revenue

---

[8] Mischaracterizing the AC, Defendants argue that "Plaintiff criticizes Nano for not performing and publishing an analysis of its competitors." Mot. at 9. Rather the AC provides *numerous* illustrative competitor examples demonstrating precisely how Defendants' timelines for commercialization are illusory.

[9] Defendants' argument that "there are no allegations to suggest Mr. Yu did not believe" that a fuel fabrication facility would provide NNE with revenue in the "near term" therefore fall flat. Mot. at 7.

[10] Though pre-Class Period and provided as background, Defendants spend a page and a half defending Defendant Walker's statement in May 2023 that approvals are "pretty much complete," claiming he could not have been referencing "design approvals" because "design approval status is not mentioned at all in the Utility Dive article." Mot. at 5-6. Yet, they do not dispute that design approval is step one in the approval process. Defendants also do not explain what other "approvals" Defendant Walker could have been referencing nor how he could have claimed approvals of any sort from any regulator were "pretty much complete" for a fuel fabrication facility when NNE had not even begun the approval process.

post-acquisition" from consulting services insulates their misstatement that NNE could earn revenue from fuel fabrication in the "near term." Mot. at 7. Putting aside the illogic of this non sequitur, Defendants yet to earn a penny from consulting services either. ECF No. 63-11 at 57. They also argue that Defendant Yu had every right to state NNE could earn revenue from fuel fabrication in the "near term" because they disclosed in other filings that "other revenue streams require regulatory approval." Mot. at 7. Stating that certain "revenue streams" require regulatory approval without disclosing that NNE had not begun the approval process *despite providing commercialization timelines for those revenue streams*, is actionable. *Macquarie Infrastructure Corp. v. Moab Partners*, *L. P.*, 601 U.S. 257, 263 (2024) (the securities laws forbid "half-truths" where a company makes true statements, but omits "critical qualifying information" concerning the subject matter of the statements).

***

Defendants argue that their timelines are opinions but concede they are actionable if "not genuinely or reasonably believe[d]." Mot. at 16. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 192-93 (2015). Defendants' statements are not framed as opinions. Moreover, the AC describes why Defendants could not have believed their timelines were feasible. The AC does not allege that Defendants "guarantee[d]" these timelines (*cf.* Mot. at 16) but rather that they had no right to tout potential timelines without also disclosing facts rendering those timelines unachievable. Further, the experts cited in the AC do not purport to "look into defendants' minds," Mot. at 17, but rather *unanimously* confirm that several undisputed facts bely any plausibility to Defendants' timelines.

### 3) Defendants Misled Investors Regarding NNE's "World Class" Teams

To convince investors their timelines were feasible, Defendants falsely touted NNE's "world class" management, scientific, and technical teams, and its "Executive Advisory Board

comprised of military, scientific and governmental experts." Though Defendants acknowledged that *management* spent *some* time on other ventures,[11] they falsely assured investors that they spent *most* of their time on NNE, characterized the risk from their "divided focus" as hypothetical, failed to disclose that they did not qualify as "world class" given their background leading floundering pump and dump ventures and because neither Defendant Yu nor Defendant Garcha possessed any nuclear expertise.[12] Defendants did not reveal that *none* of the "technical" or "scientific" team members worked for NNE full-time (including the Head of Reactor Design that Defendant Yu touted as "tirelessly" working on microreactor development, ¶¶108, 165), and most held full-time positions elsewhere. In fact, instead of prioritizing R&D, Defendants prioritized marketing and compensation. Moreover, by touting NNE's "Executive Advisory Board comprised of military, scientific and governmental experts," as a *benefit*, Defendants incurred a duty to disclose the related *detriment*--- i.e., that it included a promoter of fraudulent Chinese companies with no relevant nuclear background.[13] Where a corporation elects to speak on an issue, "there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014).

Defendants argue that the AC does not explain how management's divided focus "negatively impacted Nano" (ignoring their lack of full-time technical/scientific employees), Mot. at 8, disregarding statements from former NRC chair Burns that nuclear companies need a dedicated team of full-time employees with technical expertise who understand the regulatory

---

[11] Which the AC states, *see, e.g.*, ¶98, belying Defendants' false claim that "Plaintiff mistakenly asserts Nano did not disclose this fact." Mot. at 7.

[12] Defendants flippantly argue that "investors were free to delve into the details" that Defendants did not provide. Mot. at 10. Investors are not charged with divining that which Defendants purposefully omit nor are they charged with researching documents external to SEC filings to confirm their accuracy and completeness.

[13] Defendants argue these facts were publicly available outside their disclosures, Mot. at 10, a fact-intensive truth-on-the-market defense inappropriate for resolution at this stage. *Karimi v. Deutsche Bank Aktiengesellschaft*, 607 F. Supp. 3d 381, 394, 397 n.8 (S.D.N.Y. 2022).

framework, and who understand operability and safety criteria to successfully navigate a regulatory process that a scant few can survive. ¶78.

Defendants further argue that characterizing their teams as "world-class" is inactionable puffery. However, courts have found that the phrase "world-class" is not puffery if "when viewed in context" a reasonable investor would rely on the characterization and it "would likely influence one's view of the Company's representations as to operations." *In re Aphria Sec. Litig.*, 2020 WL 5819548, at * 9 (S.D.N.Y. Sept. 30, 2020). *See Omnicare*, 575 U.S. at 190 (actionability "always depends on context"). Defendants repeatedly told investors that NNE's management, technical, *and* scientific teams were "world-class" because a nuclear company cannot navigate the complex, expensive, and highly regulated industry without a world-class team. *In re Avon Sec. Litig.*, 2019 WL 6115349, at *16 (S.D.N.Y. Nov. 18, 2019) ("when a company makes repeated representations on the same topic, even where those representation[s] would otherwise be puffery, the repetition itself communicates to investors what matters are particularly important."); *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 663 F. Supp. 3d 334, 360 (S.D.N.Y. 2023) ("When omitted contrary facts substantially undermine the conclusion a reasonable investor would reach from a statement of opinion, that statement is misleading and actionable."). That highly disingenuous characterization, designed to influence investors' perception of NNE, is not puffery because it is easily debunked with objectively verifiable facts. *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *12 (S.D.N.Y. Nov. 26, 2018) (statements "to reassure the investing public" not puffery); *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000).[14]

The risk of operating a nuclear company with part-time leaders, part-time employees, and a disreputable advisory board is apparent because NNE had not even begun the *pre-application*

---

[14] This case is thus distinguishable from *In re Philip Morris Int'l Inc. Sec. Litig.*, 437 F. Supp. 3d 329, 350 (S.D.N.Y. 2020), *aff'd*, 89 F.4th 408, 417 (2d Cir. 2023). Mot. at 15.

process for the *design* of a microreactor or fuel fabrication facility.[15] Plaintiff is not "tak[ing] issue with Nano's business plan" or desire to "keep[] initial costs low." Mot. at 8. Plaintiff "takes issue" with Defendants falsely telling investors they *could achieve* timelines that are *unachievable*.

### 4)  Defendants Misled Investors Regarding the Lack of Government Funding

Though cash-strapped, Defendants falsely told investors that NNE's lack of government funding was an *advantage* over competitors who "are reliant on government grants and financing," because "their progress can cease once government funding is not available." ¶¶149, 188. However, with only $6 million in cash (¶72), the lack of government funding put NNE at a serious disadvantage as numerous industry experts attested. ¶¶82, 86, 90, 92. NNE did not have anywhere near the billions required to navigate the complex multi-step approval processes from design through commercialization. ¶¶37, 52, 65, 68, 71, 73, 82, 86, 90, 92. Defendants falsely argue that they "[n]ever [c]laimed a [l]ack of [g]overnment [f]unding [w]as an [a]dvantage." Mot. at 6. *That is precisely what they claimed.* ¶¶149, 188. In both the May and July Prospectuses, Defendants listed five ways in which NNE is "competitively differentiated," and "No Government Funding" topped that list. ECF No. 63-2 at 2; ECF No. 63-8 at 3.

### 5)  Defendants Misled Investors Regarding Withum

Defendants identified Withum as an "expert" but omitted that this purported "expert" auditing its consolidated balance sheets had been sanctioned and fined $2 million by the PCAOB *only three months prior* "for taking on hundreds of SPAC clients without necessary resources" to properly monitor them. ¶¶117, 122, 154, 160, 193, 200. Defendants argue they had no duty to disclose the sanction, Mot. at 10, but by touting Withum as an expert, they incurred a duty to reveal

---

[15] Defendants again cite to articles for which they did not seek judicial notice (*Compare* Mot. at 8 n. 8-9, *with* ECF No. 62) and which the Court cannot consider for the truth of the matters asserted therein. *Gentry*, 2020 WL 1467358, at *6. Regardless, both articles post-date the Class Period by at least six months and neither lend plausibility to Defendants' timelines.

information calling that "expertise" into question, *In re OSI Pharms., Inc. Sec. Litig.*, 2007 WL 9672541, at *8 (E.D.N.Y. Mar. 31, 2007) (positive statements mislead when defendants omit "adverse facts"). Defendants cannot excuse their nondisclosure by claiming the PCAOB announced the sanction, an untimely truth-on-the-market defense. Regardless, they cite to no source demonstrating any such publication occurred. *Karimi*, 607 F. Supp. 3d at 394.

### 6) <u>The Bespeaks Caution Doctrine and PSLRA Safe Harbor Do Not Apply</u>

The bespeaks caution doctrine ("BCD") and safe harbor only protect forward-looking statements accompanied by meaningful cautionary language where defendants did not have actual knowledge of falsity. *See Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 297 (S.D.N.Y. 2018) (safe harbor); *Guozhang Wang v. Cloopen Grp. Holding Ltd*., 661 F. Supp. 3d 208, 230 (S.D.N.Y. 2023) (BCD); *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010). "To be meaningful, cautionary language must precisely address the substance of the specific statement or omission that is challenged." *In re EVCI Colls. Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 102 (S.D.N.Y. 2006). The BCD also does not protect material omissions, even if the misstatement is forward-looking. *Frankfurt-Tr. Inv. Lux. AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 231 (S.D.N.Y. 2018).

Defendants generically argue these doctrines "protect all of Nano's forward looking statements," but do not actually identify any. Mot. at 11. To the extent any misstatement is forward looking, they are each alleged to be misleading for omitting *current* material facts. "'[M]ixed' statements that have both a forward-looking aspect and a representation of present or historical fact are not protected with respect to the latter." *Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 142 (2d Cir. 2010).

Moreover, Defendants concede that forward-looking statements are only protected if *accompanied* by *meaningful* cautionary language. Mot. at 12, 14. Defendants then cite to multiple

pages of generic cautionary language in a pre-Class Period S-1 that does not alert investors to the *specific* risks regarding which they misled investors, Mot. at 12-13. *See In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *11 (S.D.N.Y. Apr. 22, 2016) ("Defendants cannot escape liability by referring generally to every factor that has ever been mentioned in any one of their public statements or SEC filings …."). Specifically, Defendants can point to <u>no</u> cautionary language *in any Class Period filing* alerting investors to: (i) then-existing facts demonstrating the implausibility of the commercialization timelines; (ii) the materialized risks of management's divided focus leading other floundering ventures; (iii) the risks of employing *only* part-time technical and scientific teams; (iv) the risk of not having a single full-time employee dedicated to regulatory matters; (v) the risk of having an advisory board with members of ill-repute; (v) the risk of not having government funding; or (vi) the risk of employing a shady auditor. In the face of these omissions, boilerplate warnings that investing is "speculative," that NNE has an "unproven" business and a "short operating history," along with incomplete warnings of hypothetical risks *that have already materialized*, are hardly exculpatory.

### C.  The AC Adequately Alleges a Compelling Inference of Scienter

Scienter is adequately pled by alleging conscious misbehavior or recklessness, or motive and opportunity to defraud. *Lematta v. Casper Sleep, Inc*., 2022 WL 4637795, at *14 (E.D.N.Y. Sept. 30, 2022). Courts "accept all factual allegations in the complaint as true," and consider "all of the facts alleged, taken collectively" rather than "any individual allegation, scrutinized in isolation," to determine if an inference of scienter is "cogent and at least as compelling" as the competing inference. *Tellabs, Inc. v. Makor Issues & Rts., Ltd*., 551 U.S. 308, 309–10 (2007). A "tie goes to the plaintiff." *Id.* at 330.

### 1)  <u>The AC Alleges Conscious Misbehavior or Recklessness</u>

<u>**Commercialization Timelines**</u>: NNE is a pre-revenue company focused on developing four business lines in a highly regulated industry where oversight and attention to detail are essential. From inception, NNE has produced nothing and incurred losses. The most compelling inference is that management knew they could not commercialize a microreactor or fuel fabrication facility in their stated timelines based on the following factors, ***their awareness of which is undisputed***: (i) they had not begun the regulatory approval process for either product; (ii) they did not intend to begin the process for a microreactor until implementation of 10 CFR Part 53; (iii) they did not have the capital needed, nor government funding, to navigate the regulatory processes; (iv) they had no viable prospective source of HALEU; (v) NNE did not have *any* non-administrative full-time employees; and (vi) management spent significant time every week running other underperforming ventures.[16] It is undisputed that the executives responsible for implementing NNE's business plan had access to the regulatory status of their only potential revenue sources, information regarding NNE's finances, and information regarding NNE's employee base—i.e. "information suggesting that their public statements were not accurate." *See Emps' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015); *Novak*, 216 F.3d at 311. Under the core operations doctrine, "where alleged misstatements concern information critical to the core function of a business, knowledge of such information is properly attributable to the company and its senior executives." *See In re Virtu Fin., Inc. Sec. Litig.*, 2025 WL 847824, at *23 (E.D.N.Y. Mar. 17, 2025) (collecting cases).[17]

---

[16] Telling investors that the process is "capital intensive and would span many years," while simultaneously stating unattainable timelines are feasible, is misleading. *Cf.* Mot. at 22.

[17] Defendants cannot cite a single Second Circuit case finding the doctrine no longer viable. Mot. at 20-21. The *Virtu* case confirms no such ruling exists.

Defendants argue that the AC contradictorily alleges both that they monitored development efforts and spent  time on other ventures. Mot. at 20. There is no dichotomy. The AC alleges that management focused on NNE's development efforts "***[w]hen working on NNE as opposed to one of their other ventures***." ¶225. Indeed, it was Defendants who each *repeatedly* provided the commercialization timelines to the market and detailed NNE's development efforts. *Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*, 2019 WL 2360942, at *6 (S.D.N.Y. Mar. 4, 2019) (scienter pled where, inter alia, "the effects of competition were being closely monitored by the company's management"); *Pirnik v. Fiat Chrysler Autos., N.V.*, 2016 WL 5818590, at *7 (S.D.N.Y. Oct. 5, 2016) (frequent discussion of topic supports scienter). It was Defendant Yu who stated that the fuel fabrication business was "key to producing revenue in the near term." ¶157. Defendants held themselves out as knowledgeable on these matters, bespeaking scienter. *See, e.g.*, *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp*., 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012) (the specificity of defendants' comments regarding the company's operations was "strong circumstantial evidence" that defendants received specific relevant information). If they did not possess that knowledge, then they exhibited egregious recklessness in issuing their misstatements.

Defendants also concede their awareness of relevant regulations but argue that the AC "does not cite any regulation(s) that make Nano's estimates unobtainable." Mot. at 21. The AC comprehensively describes the complexities, uncertainties, and protraction of the existing regulatory framework, and provides illustrative examples of better-funded competitors already navigating that process, as well as expert analysis proving that NNE's estimates are unobtainable. *See, e.g.*, ¶¶50-60. The AC also explains that current regulations do not cover microreactors and

NNE does not intend to proceed until implementation of a framework that does. Defendants do not dispute any of the foregoing. Scienter is thus apparent.

**NNE's "World-Class" Teams**: It is undisputed that each Defendant had knowledge of his own employment status (a topic they raised in NNE's filings), his own experience leading floundering pump and dump ventures, and (as to Defendants Yu and Garcha) his lack of relevant nuclear background. *In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d 189, 216 (S.D.N.Y. 2004). Scienter for statements regarding NNE's "world class" management team is thus undeniable. Moreover, it is undisputed that each Defendant knew they did not employ *a single* full-time employee to work on regulatory matters, to work on microreactor development, or to work on a fuel fabrication facility. Scienter for statements touting NNE's "world class" technical and scientific teams is thus also pled.

**NNE's Shady Experts**: Defendants admit that they knew about Clark's troubling background, calling the information "well known and publicly available online." Mot. at 10. While investors are not charged with seeking out other sources to verify statements in a SEC filing, the signatories on those filings certainly must. Scienter as to statements touting the expertise of the Executive Advisory Board is thus undisputed. Similarly, Defendants admit they knew that the PCAOB had sanctioned Withum three months before the Class Period, thus conceding scienter for statements regarding Withum's expertise. *Id.*; *Cornell v. Credit Suisse Grp.*, 689 F. Supp. 2d 629, 637-38 (S.D.N.Y. 2010) (allegations that "everyone knew" bolster scienter inference).

**The Lack of Government Funding**: Defendants had to have known that NNE's lack of government funding put it at a severe disadvantage as compared to its competitors given its dearth of capital to fund regulatory efforts. Yet, they touted the lack of government funding as a competitive differentiator. While they claimed that NNE's competitors suffered the disadvantage

because their progress could stall if they lost their funding, NNE's lack of government funding has meant a lack of *any progress at all.*

### 2) **The CW and Expert Allegations Support the Scienter Inference**

[C]ourts consider and take as true the statements of confidential witnesses at the pleading stage." *GigaCloud*, 2025 WL 307378, at *7. As this Court has held, a "plaintiff may rely on confidential witnesses so long as allegations in the complaint are sufficient to provide an adequate basis for believing that the defendants' statements were false." *Id.* The AC "specifies [CW1's] position, length of employment, and job responsibilities" (*Id.* at *8) validating the basis of CW1's relevant knowledge, ¶31. Moreover, when multiple sources provide corroboratory allegations, the scienter inference is stronger. *See Lozada v. TaskUs, Inc*., 710 F. Supp. 3d 283, 324 (S.D.N.Y. 2024). Here, the CW1 and expert allegations directly align.

CW1, who communicated directly with Defendant Yu regarding the unrealistic timelines and confirmed that Defendant Yu knew where NNE stood in the approval process (nowhere), explained precisely why the timelines were implausible: (i) Defendants did not have an employee dedicated to regulatory issues, but hired interns to pump out promotional material; (ii) Defendants did not plan to proceed with the approval process until implementation of 10 CFR Part 53; (iii) Defendants did not know where NNE would build a factory; (iv) Defendants had no insight into critical timing matters; (v) NNE had no viable source for, or funding to, obtain HALEU; (vi) NNE could not afford its business plans; (vii) NNE could not afford to hire full-time employees; (viii) Defendant Yu is a "tech bro" with no nuclear knowledge who leads multiple underperforming ventures; and (ix) Defendants Walker and Garcha never came to the office, spending significant time on underperforming pump and dump ventures; ¶¶63-66, 68, 71, 73, 100-04, 107, 231. Indeed, CW1 was one of only four NNE employees that worked alongside Yu at NNE headquarters, and described Yu as a person "willing to tell half-truths whenever convenient." ¶¶31, 76.

Defendants' attacks on CW1 are illogical. They argue that CW1 could not have any relevant knowledge because CW1 is a grant writer. The suggestion that a grant writer would not have specialized knowledge of the industry and products for the grants sought is ludicrous. Regardless, the AC states that CW1 was director of energy programs, the in-house expert on the Inflation Reduction Act, the only employee with knowledge of how energy connects to the grid, researched and explained relevant policy to nuclear engineers, policymakers and the public, and researched the costs of building a nuclear factory, *in addition to writing grants*. ¶¶31, 73.

Defendants further argue that the Court should discount CW1's statements because CW1 left "months before the IPO." Mot. at 23. CW1 left NNE *three months* before the Class Period. ¶31. Nothing changed in those three months to render CW1's statements irrelevant. *See Blanford*, 794 F.3d at 307 ("[T]he Second Circuit has held that allegations concerning activity in one period can support an inference of similar circumstances in a subsequent period.").

Moreover, the expert statements in the AC confirm CW1's statements that NNE could not achieve its commercialization timelines. Specifically the experts confirm that: (i) a nuclear company needs tens of dedicated full-time employees to have a chance of successfully navigating a regulatory process a scant few will survive, ¶78; (ii) if NNE is waiting until implementation of 10 CFR Part 53, it cannot commercialize a microreactor by 2030-31, ¶79; (iii) NNE's timelines are "an impossibility," "not doable," "won't happen," and "tantamount to snake oil," ¶¶80, 81, 96; (iv) NNE has not started the process and is "pretty far off," ¶81; (v) NNE needs billions to achieve commercial readiness, ¶83; (vi) NNE will not have priority for HALEU from Centrus, which is years away from obtaining its own approvals, ¶¶83, 85, 95; (vii) licensing precedent and trends prove it is impossible for NNE to achieve a 2030 commercialization timeline for a microreactor, ¶¶86-87, 90-94; (viii) an INL audit has no regulatory significance, ¶88; and (ix) even with "every

benefit of the doubt," NNE cannot achieve its commercialization timeline, ¶89. It is irrelevant that the AC does not allege whether the experts ever met the defendants. Their corroboratory statements demonstrate that anyone running a nuclear company with knowledge of the foregoing facts (which Defendants do not dispute), had to have known the commercialization timelines were unattainable. There is no other plausible inference.

### 3) Defendants' Failure to Dispute the Report Supports the Scienter Inference

In an interview with Benzinga regarding the Report, Defendants Yu and Walker failed to dispute a single claim therein. ¶119. Instead they accused Hunterbrook of "ulterior motives," though Hunterbrook Media did not transact in NNE prior to publication, and hurled "anti-nuclear" accusations at the quoted experts though none of the quotes are "anti-nuclear." *Id.* Defendant Yu also falsely claimed Hunterbrook had not reached out to NNE seeking comment before publication. *Id.* However, thereafter, Benzinga posted an update noting that Hunterbrook provided Benzinga with two emails it sent to NNE requesting comment. *Id.*

Thereafter, Defendants issued the Demand Letter threatening legal action if Hunterbrook did not "take down the Report." ¶121. The AC provides a chart comparing the Hunterbrook allegations to the Demand Letter, illustrating that Defendants could not dispute *a single allegation*. ¶122. Moreover, despite their attempts to bully Hunterbrook into a retraction, Hunterbrook never retracted the Report and Defendants never followed through on their threat, further supporting scienter. ¶123.

### 4) The AC Alleges Motive and Opportunity

"The opportunity to commit fraud is generally assumed where the defendant is a corporation or corporate officer." *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 317 (S.D.N.Y. 2024). To adequately plead motive, plaintiffs must allege that defendants "benefitted in some concrete and personal way from the purported fraud." *ECA,*

*Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).

The AC alleges that Defendants had a motive to "sweep problems under the rug," including the impediments to commercialization and the truth regarding their "world-class" and "expert" teams so they could raise equity *four times in seven months*, for $134 million in gross proceeds. ¶114. *See San Antonio*, 732 F. Supp. 3d at 318. Had the market known the truth, Defendants could not have successfully raised funds it desperately needs for a regulatory process that costs billions, particularly given its lack of government funding.

Additionally, Defendants' "real estate transactions" support scienter because they served to enrich Defendant Yu and had no other business purpose *for NNE* given its miniscule part-time workforce. Defendants argue that Plaintiff "erroneously" alleges that NNE paid lease fees Defendant Yu when those fees actually went to Flewber Global, Inc. Mot. at 19. However, *Defendant Yu founded and runs Flewber*. ¶¶99-100, 113, 207, 230. Defendants further argue that they disclosed these transactions, Mot. at 19-20 (an inappropriate truth-on-the-market defense), but ignore allegations that they did not disclose their true purpose, ¶¶99-100, 113, 207, 230.

Moreover, motive is pled when a defendant has a financial incentive to mislead investors. *See Blank v. TriPoint Glob. Equities, LLC*, 338 F. Supp. 3d 194, 214-15 (S.D.N.Y. 2018). Despite NNE's lack of revenue and consistent losses, and though Defendants only worked for NNE *part-time,* they nonetheless paid themselves handsomely, collectively earning $2 million in 2023 and 2024. Moreover, Defendant Yu owned 35% of NNE's shares, worth over $401.3 million at NNE's Class Period high, and Defendant Walker owned 3.27% of NNE's shares, worth approximately $37.51 million. Plaintiff is not required to allege stock sales to plead motive, and Defendants have

cited no case holding otherwise. Mot. at 18. Regardless, though motive allegations can contribute to the scienter inference, they are not required. *Tellabs*, 551 U.S. at 325.

### D.  The AC Adequately Alleges Loss Causation

Fed. R. Civ. P. 8 applies to loss-causation. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005). "Pleading loss causation … is not meant to impose a great burden on plaintiffs." *IEBW Loc. 90 Pension Fund v. Deutsche Bank AG*, 2013 WL 1223844, at *12 (S.D.N.Y. Mar. 27, 2013). A plaintiff's allegations need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Barclays*, 390 F. Supp. 3d at 450. There is loss causation even if there are other plausible proximate causes of plaintiff's injuries so long as the misconduct at issue is "among them." *Id.* The AC adequately pleads loss causation by alleging that: (i) on July 19, 2024 the Report revealed that NNE's commercialization timelines were wildly overstated and that NNE did not have any non-administrative full-time employees with nuclear experience, causing NNE stock to drop 10% that day and another 17% on the following trading day; (ii) on July 23, 2024, Defendants Yu and Walker failed to dispute a single claim in the Report during an interview with Benzinga, causing NNE stock to drop 7%; and (iii) on July 31, 2024, the Barron's article validated the claims in the Report, including the NNE c-suite's concurrent roles at other failing ventures and NNE's unattainable timelines, causing NNE stock to drop 7% that day and 16.5% the following day. These allegations create a plausible causal link between the alleged misconduct and the economic harm suffered. *In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d 255, 292 (E.D.N.Y 2023).

Defendants' loss causation challenges are unavailing. First, they argue the Report is not corrective because it relies on public information.[18] As this Court has held, a "third party's analysis

---

[18] The Report's reliance on public data is noted in the AC, ¶215, contrary to Defendants' false accusation, Mot. at 26.

of a company's already-public financial information" can "contribute new information to the marketplace." *GigaCloud*, 2025 WL 307378, at *8. As in *GigaCloud*, the Report here "contributed new information extracted from the short-sellers' own investigation" including interviews with industry experts. *Id.* Tellingly, Defendants only argue that the "part-time" status of NNE's employees was already public (Mot. at 27), but cite to a SEC filing that pre-dates the Class Period, which does not reveal *inter alia* that the only NNE employees with nuclear knowledge held *full-time* positions with *other employers.* Second, they argue the Benzinga article is not corrective because it did not reveal the falsity of a prior misrepresentation. Mot. at 28. Not so. Defendants' failure to dispute *a single allegation* from the Report confirmed its accuracy and thus the inaccuracy of Defendants' misstatements. Third, they argue that the Barron's article is not corrective because it matches the Report's allegations. Mot. at 28. The fact that another reputable journalist conducted its own investigation and arrived at the same conclusion as Hunterbrook was new information validating that Defendants issued misstatements.

### E.  The AC Alleges Control Person Liability

The AC adequately alleges primary securities law violations and thus states control person claims.

## IV.  <u>CONCLUSION</u>

Plaintiff respectfully requests that the Court deny the Motion in its entirety.[19]

Dated: May 9, 2025                                      Respectfully submitted,

                                                        POMERANTZ LLP

                                                        */s/ Tamar A. Weinrib*

                                                        POMERANTZ LLP
                                                        Tamar A. Weinrib

---

[19] If the Court grants the Motion for any reason, Plaintiff respectfully requests the opportunity to amend. *See Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 215-16 (S.D.N.Y. 2020).

(*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
taweinrib@pomlaw.com

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Lead Counsel for Plaintiff*

Junbo Hao
HAO LAW FIRM
BEIJING HAO JUNBO LAW FIRM
Room 3-401 No. 2 Building,
No. 1 Shuangliubei Street
100024 Beijing
People's Republic of China
Telephone: +86 137-1805-2888
jhao@haolaw.cn

*Additional Counsel for Plaintiff*

## <u>CERTIFICATE OF WORD COUNT COMPLIANCE</u>

The undersigned, counsel of record for Lead Plaintiff, certifies that this brief contains 8,723 words, as reported by the word processing program used to prepare this document, which complies with the word limit of L.R. 7.1(c).

Dated: May 9, 2025                                         Respectfully submitted,

                                                                  */s/ Tamar A. Weinrib*