UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                                              :
HONGUI XIE, individually and on behalf of all others          :
similarly situated,                                           :
                                                              :
                              Plaintiff,                       :            24-CV-6057 (JMF)
                                                              :
              -v-                                             :            OPINION AND ORDER
                                                              :
NANO NUCLEAR ENERGY, et al.                                   :
                                                              :
                              Defendants.                     :
                                                              :
-------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

        In this putative class action, Lead Plaintiff Hongui Xie brings securities fraud claims

against Nano Nuclear Energy ("Nano") and several of its officers and directors.  The operative

Second Amended Complaint (the "Complaint") alleges that, between May 8, 2024 and July 30,

2024, Defendants made material misstatements with respect to, among other things, Nano's

leadership team and advisory board, its prospects for bringing a nuclear microreactor to market,

and its prospects for building an operational fuel fabrication facility, all in violation of Sections

10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C.

§§ 78j(b), 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5 ("Rule 10b-5"),

17 C.F.R. §§ 240.10b-5.  Defendants now move, pursuant to Federal Rule of Civil Procedure

12(b)(6), to dismiss the Complaint for failure to state a claim.  For the reasons that follow,

Defendants' motion is GRANTED and the Complaint is dismissed, albeit with leave to amend.

## BACKGROUND

        The following facts, taken from the Complaint, documents it incorporates, and matters of

which the Court may take judicial notice, are construed in the light most favorable to Xie.  *See,*

*e.g., Kleinman v. Elan Corp., PLC*, 706 F.3d 145, 152 (2d Cir. 2013); *see also, e.g., ATSI*

*Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (stating that a court may consider "legally required public disclosure documents filed with the SEC").

Nano is an early-stage nuclear energy company with a four-prong business model focused on the design and manufacture of nuclear microreactors, the construction of fuel fabrication facilities, and the development of a fuel transportation business and nuclear consultation services. *See* ECF No. 59 ("SAC"), ¶ 2; ECF No. 63-1 ("Form S-1"), at 10-12. Defendant Jay Yu is the Founder and Chairman of Nano, Defendant James Walker is its Chief Executive Officer, and Defendant Jaisun Garcha is its Chief Financial Officer. *See* SAC ¶¶ 25-27. On May 8, 2024, Nano commenced an initial public offering ("IPO") of approximately 2.5 million shares of common stock and began trading on the Nasdaq Capital Market at a price of $4.00 per share. *Id.* ¶ 3. The IPO eventually closed with net proceeds of $9,000,000. *Id.* ¶ 159; ECF No. 63-15. Xie, whom the Court appointed as Lead Plaintiff, *see* ECF No. 41, purchased 108,637 shares of Nano common stock between May 8, 2024, when the IPO commenced, and July 30, 2024 — the Class Period, *see* ECF No. 28, at 8. Xie alleges that, as a result of false and misleading statements by Defendants, she incurred losses of approximately $244,899. *See id.*

Xie's sprawling Complaint identifies no fewer than twenty-nine allegedly false or misleading statements. *See* SAC ¶¶ 140, 142, 144, 146, 148, 150, 152, 154, 156, 158, 160, 162, 164, 166, 168, 170, 172, 174, 175, 177, 179, 181, 183, 185, 187, 189, 191, 193, 195. The statements appeared in nine different SEC filings, press releases, and published interviews between May 7, 2024, and July 14, 2024. *See* SAC ¶¶ 138, 157, 159, 161, 163, 165, 167, 176, 178; *see also* ECF Nos. 63-2, 63-7, 63-14, 63-15. Broadly speaking, Xie challenges three categories of statements. The first are statements regarding Nano's leadership, technical team, advisory board, and auditor. On that front, Xie argues that it was deceptive for Defendants to claim that they had a "world class team," *see* SAC ¶¶ 167-68, to tout the presence on Nano's

Executive Advisory Board of former New York Governor Andrew Cuomo and General Wesley Clark, *see id.* ¶¶ 190-91, and to identify Nano's auditor, WithumSmith & Brown, PC ("Withum") as an "expert" without revealing that it had been fined by the Public Company Accounting Oversight Board ("PCAOB") "for taking on hundreds of SPAC clients without necessary resources to properly monitor them," *see id.* ¶¶ 153-54 (internal quotation marks omitted).

The second category of challenged statements are those describing the state of Nano's affairs and the progress Nano had already made towards its corporate goals, including the development of its microreactors and completion of its fuel fabrication facility.  For example, Xie argues that Defendants misled investors in stating that Nano had a competitive advantage due to its current lack of government funding, *see id.* ¶¶ 149-50; that it had completed design audits for two of its proposed microreactors, *see id.* ¶¶ 171-72; that it had executed a memorandum of understanding with a company called Centrus concerning Centrus's provision of High-Assay Low-Enriched Uranium (HALEU) to a Nano subsidiary, *see id.* ¶¶ 155-56; that it had been working with the Department of Energy and the Idaho National Laboratory on fuel fabrication facility plans, *see id.* ¶¶ 147-48; and that it had an exclusive patented license to transport HALEU fuel for the advanced nuclear energy industry, *see id.* ¶¶ 159-60.

The last category of allegedly false or misleading statements identified by Xie concerns Nano's expectations and intentions for the future.  Specifically, Xie alleges Defendants deceived investors in stating that Nano intended to use the net proceeds of its IPO to support its research and development objectives, *see id.*; that it was expecting its transportation and HALEU businesses to produce revenue in the near term, *see id.* ¶¶ 157-58; that it hoped to have a microreactor product on the market by 2030 or 2031, *see id.* ¶¶ 176-77; and that it hoped to have a fuel fabrication facility operational by 2027, *see id.* ¶¶ 173-74.

On July 19, 2024, a website called Hunterbrook Media published a report about Nano titled "Fission Impossible: Nano Nuclear has no revenue, no Products, 'Laughable' Timelines, Part-Time Executives, and a $600 Million Market Cap."  SAC ¶ 10; ECF No. 63-12 ("Hunterbrook Report").  The Hunterbrook Report called into question, among other things, the timelines that Nano had broadcasted for its commercialization of a nuclear microreactor and construction of a fuel fabrication facility.  SAC ¶ 11.  The Hunterbrook Report also stated that Nano's senior leadership worked as independent contractors, that many of Nano's employees were part-time, and that Nano had not formally begun the regulatory process to obtain approval for its microreactors.  *Id.* ¶¶ 12-13.  A few days later, a website called Benzinga published an interview with Defendants Yu and Walker in which they responded to the Hunterbrook Report. *Id.* ¶ 119.  A week after the Benzinga interview, the website Barron's published an article also calling into question various aspects of Nano's business.  *Id.* ¶ 15.  Xie alleges that the Hunterbrook Report, the Benzinga interview, and the Barron's report together caused a drop in Nano's share price from $19.30 to $9.86 by August 1, 2024.  *See id.* ¶¶ 118, 125.[1]

## LEGAL STANDARDS

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff.  *See Giunta v. Dingman*, 893 F.3d 73, 78-79 (2d Cir. 2018).  A court will not dismiss any claims unless the plaintiff has failed to plead sufficient facts to state a claim to relief that is facially plausible, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) — that is, one that contains "factual content that allows the court to draw the reasonable inference that the

---

[1]    Although not pertinent to the instant motion, Defendants ask the Court to take judicial notice that Nano's stock price was $30.26 on the day the Complaint was filed.  *See* ECF No. 61, at 2.

defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

More specifically, the plaintiff must allege facts showing "more than a sheer possibility that a

defendant has acted unlawfully." *Id.* A complaint that offers only "labels and conclusions" or "a

formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

Further, if the plaintiffs "have not nudged their claims across the line from conceivable to

plausible, their complaint must be dismissed." *Id.* at 570.

To the extent that a plaintiff alleges fraud under the federal securities laws, she must also

satisfy the heightened pleading requirements of both Rule 9(b) of the Federal Rules of Civil

Procedure and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b)(2).

To satisfy Rule 9(b), a plaintiff generally "must '(1) specify the statements that the plaintiff

contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were

made, and (4) explain why the statements were fraudulent.'" *Anschutz Corp. v. Merrill Lynch &

Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir.

2004)). To satisfy the PSLRA, a complaint must, "with respect to each act or omission alleged

to [constitute securities fraud], state with particularity facts giving rise to a strong inference that

the defendant acted with the required state of mind." *United States ex rel. Chorches v. Am. Med.

Response, Inc.*, 865 F.3d 71, 88 n.14 (2d Cir. 2017) (quoting 15 U.S.C. § 78u-4(b)(2)); *see In re

Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 22 (S.D.N.Y. 2016) (noting that a plaintiff

"must allege facts supporting a strong inference with respect to each defendant"). The "strong

inference" must be "more than merely plausible or reasonable." *Tellabs, Inc. v. Makor Issues &

Rts., Ltd.*, 551 U.S. 308, 314 (2007). The necessary inquiry is "inherently comparative." *Id.* at

323. That is, the Court "must consider plausible, nonculpable explanations for the defendant's

conduct, as well as inferences favoring the plaintiff." *Id.* at 324. Thus, a complaint alleging

securities fraud will survive "only if a reasonable person would deem the inference of scienter

cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

## DISCUSSION

As noted, Xie brings claims under Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5.  To state a claim under Section 10(b) and Rule 10b-5(b), a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011); *accord Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 212 (2d Cir. 2020).  To state a control person claim under Section 20(a), a plaintiff must, at a minimum, plead a "primary violation" of Section 10(b).  *See, e.g.*, *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996); *Total Equity Cap., LLC v. Flurry, Inc.*, No. 15-CV-4168 (JMF), 2016 WL 3093993, at *2 (S.D.N.Y. June 1, 2016).

In addition, "the federal securities laws have two separate, but similar, protections for forward-looking statements," *SEC v. Thompson*, 238 F. Supp. 3d 575, 602 (S.D.N.Y. 2017), which are "contingent statements" that "forecast future events," *Gross v. GFI Grp., Inc.*, 310 F. Supp. 3d 384, 393 (S.D.N.Y. 2018).  The first, which "does not apply to statements made in connection with an initial public offering, such as an IPO prospectus," is the PSLRA's statutory "safe harbor."  *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 398 (S.D.N.Y. 2018). Under that provision, a securities fraud claim does not lie based on a forward-looking statement if "(1) the forward-looking statement is identified and accompanied by meaningful cautionary language, (2) the forward-looking statement is immaterial, *or* (3) the plaintiff fails to prove that [the forward-looking statement] was made with actual knowledge that it was false or misleading."  *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 245 (2d Cir. 2016) (emphasis added);

*see also* 15 U.S.C. § 78u–5(c).  "Because the safe harbor is written in the disjunctive, a forward-looking statement is protected under the safe harbor if any of the three prongs applies."  *Id.* at 245-46 (cleaned up).  The second protection for forward-looking statements, which does apply to statements made in connection with an IPO, is the "bespeaks caution" doctrine.  *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 396 (S.D.N.Y. 2020).  It provides that alleged misrepresentations are inactionable if they are accompanied by adequate cautionary language.  *See Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002).

Measured against these standards, Xie's claims fail as a matter of law.  First, many of the statements that Xie challenges do not qualify as actionable misrepresentations or omissions.  Second, as to most — if not all — of the statements at issue, Xie fails to adequately allege that Defendants acted with the requisite scienter.  Finally, many of the statements are forward-looking and protected by either or both the PSLRA safe harbor or the bespeaks caution doctrine.  The Court will address each point in turn.

## A.  Misrepresentations and Omissions

For starters, many of the statements that Xie challenges do not even qualify as actionable misrepresentations or omissions.[2]  Xie fails to establish, for example, that three of the challenged statements were false at all.  First, contrary to Xie's assertions, the Complaint itself establishes that Defendants' statements about Nano's intention to use the net proceeds from its IPO to fund research and development ("R&D") were not false.  The statements to which Xi refers included a

---

[2]    The Complaint identifies some statements as false or misleading that were made almost a year before the class period begins.  *See* SAC ¶¶ 136-137.  Xie expressly disavows reliance on these statements for her claims, *see* ECF No. 65 ("Pl.'s Mem."), at 12 n.10, so the Court need not address them.  In any event, it is well established that "pre-Class Period statements are not actionable" in a securities fraud class action.  *Steamfitters Loc. 449 Pension Plan v. Skechers U.S.A., Inc.*, 412 F. Supp. 3d 353, 367 n.4 (S.D.N.Y. 2019).

laundry list of intended uses, including "general corporate purposes and working capital," SAC ¶¶ 159-60, and the Complaint itself alleges that, "for the nine months ended June 30, 2024, [Nano] spent . . . $2.8 million on R&D," *id.* ¶ 73. Second, Xie challenges Defendants' statement that they "have been working with the [Department of Energy ('DOE')] and [the Idaho National Laboratory ('INL')] on [their] fuel fabrication facility plans." *Id.* ¶¶ 147-48. But Xie herself acknowledges the possibility that Defendants had "engaged in informal communications with INL," *id.* ¶ 48, and, as to the DOE, she alleges only that Nano "had not received any funding from the DOE," *id.*, which does not mean that Defendants' statement about working with the DOE was false.

Third, Xie argues that investors were misled by Defendants' references to Nano's "exclusive patented license to transport commercial quantities of HALEU fuel needed for the future of the advanced nuclear industry." *Id.* ¶ 159. She argues that this statement was misleading because Defendants did not reveal that the patent in question actually "belonged to Battelle Energy Alliance, not Nano." *Id.* ¶ 160. But Nano did not claim to own the patent; it claimed only an "exclusive . . . license" to the patent. *Id.* ¶ 159. And even more significant, the fact that the patent was owned by Battelle was discussed at length in Nano's SEC filings. *See, e.g.*, ECF No. 63-2 ("Prospectus"), at 14. As to these three statements, therefore, Xie fails to "allege the reason or reasons why" they were "false or misleading." *Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 170 (S.D.N.Y. 2015). Alternatively, Defendants' "disclosure of the very information [Xie] contend[s] [Defendants] . . . omitted . . . renders these purported omissions immaterial as a matter of law." *In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d 459, 476 (S.D.N.Y. 2017).

Next, several of the statements that Xie challenges qualify as inactionable puffery. Puffery includes "statements [that] are too general to cause a reasonable investor to rely upon

them," *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009), and thus "cannot have misled a reasonable investor," *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 811 (2d Cir. 1996). The Second Circuit has identified two categories of puffery: "(1) subjective statements that cannot be proven true or false" and "(2) objective statements that can be proven true or false but are so exaggerated that no reasonable buyer could justifiably rely on them." *MacNaughton v. Young Living Essential Oils, LC*, 67 F.4th 89, 96 (2d Cir. 2023). The first category includes statements that "mention nothing specific, but rather amount to general claims of superiority expressed in broad, vague, and commendatory language that are considered to be offered and understood as an expression of the seller's opinion only." *Id.* (cleaned up); *accord Philip Morris Cos.*, 75 F.3d at 811.

Although alleged to be false or misleading by Xie, Defendants' characterizations of their "management team" and "technical team" as "world-class," SAC ¶¶ 139-40, fall comfortably within this category.[3] They are purely subjective — and thus unverifiable — and too general to warrant reasonable reliance. Indeed, the statements in question are "nearly identical to statements that have been held to be non-actionable puffery by courts in this Circuit." *Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 347 (S.D.N.Y. 2015) (concluding that a statement describing a company's "world-class compliance function" was "non-actionable puffery"); *In Re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 417 (2d Cir. 2023) (holding that a description of scientists as "expert" and "world class" was "inactionable as mere puffery" (internal quotation

---

[3]    Xie conspicuously limits her challenge to Defendants' broadest statements. She argues only that Defendants' teams "did not qualify as 'world class'" in a general sense and does not dispute the more specific representations included in those same statements — such as, for example, that the technical team "ha[d] a deep knowledge of applicable regulatory requirements surrounding safety, transportation, and decommissioning." SAC ¶ 139.

marks omitted)).  Xie's response — that the characterizations of Nano's teams as "world class" are actionable because Defendants used the phrase repeatedly and the characterizations would therefore "likely influence one's view of the Company's representations as to operations," Pl.'s Mem. 15 — is unconvincing.  The cases that Xie cites to support this proposition say only that "[w]hether a representation is 'mere puffery' depends, in part, on the context in which it is made."  *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015).  Nothing about the context of the statements Defendants made here, however, suggests that they were more than "generally optimistic opinions" that are "precisely the type of puffery that [courts] have consistently held to be inactionable."  *In re Philip Morris*, 89 F.4th at 417.

Finally, Xie's contention that some of Defendants' statements were false and misleading because they omitted material information does not withstand scrutiny.  "For an omission to be actionable" as securities fraud, "the securities laws must impose a duty to disclose the omitted information."  *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002).  Most relevant here, "a duty to disclose arises when disclosure is necessary to make prior statements not misleading."  *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993); 17 C.F.R. § 240.10b-5(b) (stating it is unlawful to "omit to state a material fact necessary in order to make the statements made . . . not misleading").  Significantly, however, for an omission to support a claim, there must be a "sufficiently close nexus" between the statement and the omission.  *See In re Omega Healthcare Invs., Inc. Sec. Litig.*, 563 F. Supp. 3d 259, 272-73 (S.D.N.Y. 2021) ("[T]o prevail on [an omission] theory, plaintiffs must establish a sufficiently close nexus between the affirmative statement and the alleged omission to demonstrate that" there is "a duty to disclose the omitted information . . . in order to prevent the statement from being materially misleading."); *see also Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 296 (S.D.N.Y. 2019) (collecting cases).  "[T]he subject matter of the alleged statement must relate closely enough to the allegedly omitted

information such that a reasonable investor might have drawn inferences about the omitted information because of the statement." *Buhrke Fam. Revocable Tr. v. U.S. Bancorp*, 726 F. Supp. 3d 315, 340 (S.D.N.Y. 2024).

In Xie's case, the Complaint "nowhere explains . . . how [the] alleged omissions rendered any of Defendants' prior statements false or misleading." *Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*, No. 14-CV-9443 (ER), 2016 WL 2859622, at *9 (S.D.N.Y. May 16, 2016). For example, Xie alleges that Defendants' statement that they had "assembled an Executive Advisory Board comprised of military, scientific and governmental experts" including General Clark and former Governor Cuomo was misleading because Defendants did not also disclose that General Clark was chairman of a company that was "an aggressive promoter" of fraudulent Chinese firms or that Governor Cuomo "had resigned . . . following a sex scandal and has no known background in nuclear technology." SAC ¶¶ 151-52. But no reasonable investor would have "drawn inferences" about this omitted information from the undisputed and benign identifications of Governor Cuomo as a governmental expert and General Clark as a military expert. Put simply, Xie does "not allege any rational connection between the omitted information and the statements made." *Friedman v. Endo Int'l PLC*, No. 16-CV-3912 (JMF), 2018 WL 446189, at *5 (S.D.N.Y. Jan. 16, 2018).

The same is true for three other sets of statements challenged by Xie, beginning with Defendants' statements that Nano had engaged Withum as its "independent registered public accounting firm" and that the firm had audited Nano's consolidated balance sheets and its changes in stockholders' equity and cash flows. SAC ¶¶ 153-54. These statements were literally true. That is, Xie does not dispute that Nano was audited by Withum; nor does she question the validity of Withum's conclusions in that audit. Instead, she argues that the statements misled investors because they omitted the fact that Withum had been fined $2 million by the PCAOB

"for taking on hundreds of SPAC clients without necessary resources to properly monitor them."
*Id.* ¶ 154.  But "no reasonable investor would infer anything about the state of [Withum's regulatory] compliance" based only on Nano's generalized statement that Withum had audited its consolidated balance sheets.  *SEC v. SolarWinds Corp.*, 741 F. Supp. 3d 37, 90 n.37 (S.D.N.Y. 2024) (internal quotation marks omitted).

So too, Defendants' references to having "conducted and completed a design audit" for Nano's two microreactor designs do not support a securities fraud claim.  *Id.* ¶ 145.  Xie argues that these statements were misleading because "an INL audit" — to which Defendants' statement refers — "is an informal process with no regulatory significance."  *Id.* ¶ 146.  But Defendants' statement nowhere claims that the audit was a formal process or that it had regulatory significance.  Thus, "[n]o reasonable investor would have construed this statement to make any representation regarding any of the omitted facts."  *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 569 (S.D.N.Y. 2011).  Put differently, Xie's argument "relies on reading inferences and assertions into defendants' statements that are not plausibly there."  *Hubiack v. Li-Cycle Holdings Corp.*, No. 23-CV-9894 (JSR), 2024 WL 2943959, at *7 (S.D.N.Y. June 10, 2024).

And third, Xie's claim that Defendants misled investors because they "falsely told investors" that their lack of government funding "was an advantage" does not withstand scrutiny. SAC ¶ 149.  For one thing, Xie's characterization of this statement is questionable.  Defendants never characterized their lack of funding as an "advantage"; and while they did imply that Nano was "competitively differentiated" by its lack of government funding, they also disclosed that Nano "will seek available government funding opportunities in the future."  Prospectus 9-10.  To the extent that Xie argues that the statement was false or misleading because Nano lacked the capital required "to take its microreactors and fuel fabrication facility successfully through the NRC approval process from design through operation," SAC ¶ 150, the very same statement

acknowledges that the company's "limited operating history . . . makes an evaluation of [its] business and prospects very difficult" and that it "may need to raise additional capital" in the future.  Prospectus 9-10.

Finally, Xie argues that Defendants misled investors with their statements that Nano's "subsidiary HALEU Energy entered into a memorandum of understanding with Centrus" and that, "[p]ursuant to [that] agreement, both parties [would] explore the possibility of Centrus providing [HALEU] to HALEU Energy, as needed, to support HALEU Energy's research, development, and commercialization efforts, for fuel qualification, for [its] initial test reactor cores and [its] commercial variant micro reactors."  SAC ¶ 155.  But Xie does not dispute that these statements were literally true.  Instead, she that they were misleading "because Defendants omitted that Centrus is years away from receiving regulatory approval and is still upgrading their technology, Centrus does not currently have the funding to scale production, [Nano] does not have a government grant or any other sufficient source of capital to fund procurement of HALEU from Centrus, and multiple better funded SMR companies that are further along in the development process than [Nano] will be ahead of [it] to purchase HALEU from Centrus."  *Id.* ¶ 156.  For the most part, however, these challenges pertain to forward-looking aspects of the statements — that is, "forecasts of future events," *In re Barrick Gold Corp. Sec. Litig.*, 341 F. Supp. 3d 358, 376 (S.D.N.Y. 2018) (cleaned up) — and fail for reasons discussed below in Section C.  And regardless, Xie fails to plausibly allege that the allegedly omitted information rendered Nano's true statements about its relationship with Centrus false or misleading.

## B.  Scienter

Second, and in any event, as to most — if not all — of the challenged statements, Xie fails to adequately allege scienter.  In this Circuit, a plaintiff can demonstrate scienter in either of two ways: "by alleging facts to show either (1) that defendants had the motive and opportunity to

commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness."

*ECA*, 553 F.3d at 198.  To satisfy the "motive and opportunity" prong, a plaintiff must allege that

a defendant "benefitted in some concrete and personal way from the purported fraud."  *Id.*

(quoting *Novak v. Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2000)).  "[T]he desire for the

corporation to appear profitable and the desire to keep stock prices high to increase officer

compensation, do not constitute 'motive' for purposes of this inquiry."  *Id.*  Instead, to satisfy the

"motive" prong, a plaintiff must generally show that "corporate insiders allegedly ma[de] a

misrepresentation in order to sell their own shares at a profit."  *Id.*  If a plaintiff is unable to make

that showing, she may resort to the "strong circumstantial evidence" prong."  *Id.* at 198-99.  But

if there is no evidence of motive, "the strength of the circumstantial allegations must be

correspondingly greater."  *Id.* (quoting *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)).  A

plaintiff can make the necessary showing of "strong circumstantial evidence" by pleading that

"defendants (1) 'benefitted in a concrete and personal way from the purported fraud'; (2)

'engaged in deliberately illegal behavior'; (3) 'knew facts or had access to information

suggesting that their public statements were not accurate'; or (4) 'failed to check information

they had a duty to monitor.'"  *Id.* (quoting *Novak*, 216 F.3d at 311).

　　　Xie's allegations here fall short of these demanding requirements.  First, she does not

plead facts sufficient to support the inference that Defendants had a motive to commit fraud.  Xie

argues that her allegations of motive are sufficient because Defendants' actions enabled them to

raise substantial equity for Nano.  *See* Pl.'s Mem. 25.  But such a motive is "generally possessed

by most corporate directors and officers" and, thus, does "not suffice."  *Kalnit*, 264 F.3d at 139.

Nor is it enough that Defendants were able to "pa[y] themselves handsomely" because of Nano's

available capital or that their shares increased in value.  *See* Pl.'s Mem. 25.  "[B]onuses based on

corporate earnings and higher stock prices do[] not strengthen the inference of fraudulent intent"

unless the plaintiff can show a "direct link between the compensation package and the fraudulent statements," which Xie fails to do here. *ECA*, 553 F.3d at 201; *see also San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 318 (S.D.N.Y. 2024). Finally, Xie asserts that a motive to commit fraud can be found in the payment of lease fees to an altogether different company that Defendant Yu founded. *See* Pl.'s Mem. 25. But she fails to identify any nexus between these transactions and the allegedly fraudulent statements at issue.

Second, Xie also fails to establish strong circumstantial evidence of conscious misbehavior or recklessness. For the most part, Xie relies in this regard on a generalized assertion that many of Defendants' statements about Nano's timelines (regarding, for example, the development of its microreactor) were "ludicrous" and "frankly laughable." SAC ¶ 4. But that assertion is questionable on its own terms because, as Xie herself acknowledges, the regulatory picture surrounding the licensing of microreactors is far from clear and might be changing dramatically in the coming years. *Id.* ¶¶ 57, 61. For example, the Complaint itself cites, and does nothing to rebut, Defendants' assertions that "there is no regulatory framework in place tailored to microreactors" and that there are therefore "no 'historic' benchmark[s] for obtaining approvals given that microreactors are a new technology." SAC ¶ 119. Additionally, the Complaint explains that the Nuclear Regulatory Commission is "working on a new . . . licensing framework that is suitable for a new generation of reactors" such as those Defendants are hoping to commercialize and which are "fundamentally different from the reactors currently in operation now, and that the current rules are drafted to regulate." *Id.* ¶ 57. It goes on to describe the "Accelerating Deployment of Versatile, Advanced Nuclear for Clean Energy ('ADVANCE') Act," which was signed into law in 2024, and which is "meant to . . . reduce regulatory costs for companies seeking to license advanced nuclear reactor technologies." *Id.* ¶ 61. The new regulatory framework for microreactors is not scheduled to be completed until

2027. *Id.* at ¶¶ 57, 61. It is therefore unclear how Xie could show at this stage that Defendants knew their future predictions were false. *Cf. In re HEXO Corp. Sec. Litig.,* 524 F. Supp. 3d 283, 302 (S.D.N.Y. 2021) ("[P]laintiffs have not alleged facts detailing defendants' contemporaneous knowledge . . . or even how the defendants could have told the future."). That is all the more so because, as noted, "the strength of the circumstantial allegations" required to prove recklessness "must be correspondingly greater" when "a plaintiff fails to allege adequate motive," as Xie does here. *In re PXRE Grp., Ltd. Sec. Litig.*, 600 F. Supp. 2d 510, 535 (S.D.N.Y. 2009).

Nor is the Court persuaded by Xie's invocation of the "core operations" doctrine, which provides that "where alleged misstatements concern information critical to the core function of a business, knowledge of such information is properly attributable to the company and its senior executives." *In re Virtu Fin., Inc. Sec. Litig.*, 770 F. Supp. 3d 482, 523 (E.D.N.Y. 2025). For one, "it is far from clear that the core operations doctrine remains valid in light of the PSLRA." *Marcu v. Cheetah Mobile Inc.*, No. 18-CV-11184 (JMF), 2020 WL 4016645, at *8 (S.D.N.Y. July 16, 2020). For another, core-operations allegations are, at best, "supplementary" — they are not "independently sufficient means to plead scienter." *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 353 (S.D.N.Y. 2011); *accord Virtu Fin.*, 770 F. Supp. 3d at 523. And the doctrine applies only when "the operation in question constitutes nearly all of a company's business." *Reilly v. U.S. Physical Therapy, Inc.*, No. 17-CV-2347 (NRB), 2018 WL 3559089, at *18 (S.D.N.Y. July 23, 2018) (cleaned up); *see, e.g.*, *id.* (collecting cases where the "core operations" doctrine has applied including, for example, a case in which revaluation of an asset "result[ed] in a restatement of retained earnings from $185 million to an accumulated deficit of $178 million"); *Barrett v. PJT Partners Inc.*, No. 16-CV-2841 (VEC), 2017 WL 3995606, at *9 (S.D.N.Y. Sept. 8, 2017) (observing that the "core operations" doctrine applies when defendants claim ignorance of facts central to the daily functioning of a business —to infer, for example, "that senior

managers [at a company] were aware that a contract accounting for 18% of corporate revenue had been repudiated").  Here, Xie fails to identify any "core operation" of Nano fitting these parameters, let alone contradicting Defendants' stated belief that the changing regulatory landscape surrounding nuclear microreactors might allow them to commercialize their designs within the next six years.

Ultimately, Xie's strongest argument for scienter rests on a confidential witness, who reports that he "communicated to Defendant Yu that [Nano's] stated timelines were unrealistic." SAC ¶ 231.  But the subjective opinion of one employee is a thin reed upon which to rest a strong inference of conscious misbehavior or recklessness.  *See, e.g.*, *In re PXRE Grp.*, 600 F. Supp. 2d at 540 ("[T]he Court does not find one employee's expression of 'concern' . . . necessarily constitutes evidence of negligence, let alone recklessness.").  Moreover, "[c]ourts discount [confidential witness] allegations where the complaint fails to establish the witnesses' basis of knowledge for the pleadings attributed to them."  *In re Canopy Growth Sec. Litig.*, No. 23-CV-4302 (PAE), 2024 WL 3445436, at *13 (S.D.N.Y. July 17, 2024); *see also In re Pall Corp.*, No. 07-CV-3359 (JS) (ARL), 2009 WL 3111777, at *6 (E.D.N.Y. Sept. 21, 2009) (stating that allegations of confidential witnesses in securities fraud cases require "an examination of . . . the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, . . . the coherence and plausibility of the allegations, and similar indicia").  The Complaint here alleges that the confidential witness was Nano's "director of energy programs," who was "hired . . . to write grants" and served as the "in-house expert on the Inflation Reduction Act."  SAC ¶ 31.  But nothing in the Complaint supports the inference that the confidential witness had expertise in the licensing of nuclear microreactors under a regulatory process that had — and has — yet to be defined.  Moreover, even assuming *arguendo* that the confidential witness had "an established basis of knowledge," Xie would still need to "allege

specific instances in which the individual defendants received information" from the witness.  *In re Canopy Growth*, 2024 WL 3445436, at *13 (internal quotation marks omitted); *see also Novak*, 216 F.3d at 314.  She fails to do so, alleging only that the confidential witness "described telling Defendant Yu in person in [Nano's] offices" at some undefined point "during the course of [the confidential witness's] employment that the 2030-31 deadline was unrealistic."  SAC ¶ 64.[4]

## C.  The PSLRA Safe Harbor and the Bespeaks Caution Doctrine

Finally, and in any event, Defendants' statements regarding Nano's ability to bring a microreactor to market by 2030, to have an operational fuel fabrication facility by 2027, to generate near-term revenue through its fuel-transportation and HALEU lines of business, and to be supplied with HALEU by Centrus were all forward-looking statements protected by either or both the PSLRA safe harbor or the bespeaks caution doctrine because they were accompanied by meaningful cautionary language.  "To determine whether cautionary language is meaningful, courts . . . identify the allegedly undisclosed risk and then read the allegedly fraudulent materials — including the cautionary language — to determine if a reasonable investor could have been misled into thinking that the risk that materialized and resulted in his loss did not actually exist."  *In re HEXO Corp.*, 524 F. Supp. 3d at 307 (internal quotation marks omitted).  Significantly, for the statutory safe harbor or bespeaks caution doctrine to apply, it is not necessary that "cautionary language be contained in the same document or communication or derive from the same source."  *In re Merrill Lynch Auction Rate Sec. Litig.*, 851 F. Supp. 2d 512, 537 (S.D.N.Y. 2012).  Instead, "when the forward-looking statement is made at the time a company makes a

---

[4]    In any event, the information communicated by the confidential witness relates only to Defendants' statements regarding the timelines for the development of microreactors, *id.* ¶¶ 64, 231, and the monetization of Nano's fuel fabrication line of business, *id.* ¶ 68, and, as discussed below, they are protected by the PSLRA safe harbor or the bespeaks caution doctrine.

filing with the SEC that contains meaningful cautionary language on the topic, the cautionary language in the filing protects the contemporaneous forward-looking statement." *Siegel v. Bos. Beer Co., Inc.*, No. 21-CV-7693 (DLC), 2022 WL 17417111, at *4 (S.D.N.Y. Dec. 5, 2022) (internal quotation marks omitted).

Here, Defendants' forward-looking statements were "accompanied by a formidable array of cautionary language in [Nano]'s contemporaneous SEC filings." *In re Vroom, Inc. Sec. Litig.*, No. 21-CV-2477 (PGG), 2025 WL 862125, at *32 (S.D.N.Y. Mar. 18, 2025). In fact, the risks that Xie identifies were discussed — extensively — in many of the very documents that contained the challenged statements. For example, Nano's very first set of disclosures in connection with its IPO, the Form S-1 on March 19, 2024, prominently included a twenty-eight-point "Summary of Significant Risks" and an eighteen-page section titled "Risk Factors" that discussed the many factors that might make an investment in Nano speculative or risky. *See* Form S-1, at 27-56. These disclosures and warnings were then repeated or incorporated by reference in Nano's subsequent public filings. *See, e.g.*, ECF No 63-15, at 2-3 (May 13, 2024 press release); ECF No. 63-7, at 4-5 (June 20, 2024 10-Q); ECF No. 63-8, at 19-20 (July 11, 2024 424B4 Prospectus); *see also In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 215-16 (S.D.N.Y. 2022) ("Courts in this Circuit routinely find that references to SEC filings that expound more fully on the risks suffice to adequately convey the risks."). And the remaining challenged forward-looking statements were substantially contemporaneous.

Moreover, the risks that Xie argues investors were exposed to by Defendants' statements were adequately forecasted in these disclosures. For example, the disclosures stated that the timelines Nano had described for the commercialization of nuclear reactors were "estimations only and [] inherently subject to change due to certain factors, including . . . uncertainties associated with the licensing process." Form S-1, at 27. They went on to warn that "[d]elays or

denials in obtaining [the necessary] approvals c[ould] significantly impact [the] project's timeline and cost." *Id.* at 28. Similar warnings applied to Nano's plan for a fuel fabrication facility, including a statement that "[o]btaining the necessary licenses and permits from regulatory authorities can be a complex and time-consuming process" and another that "regulatory approvals . . . can extend the timeline for facility development, potentially affecting market entry and revenue generation." *Id.* at 30-31. As to the memorandum of understanding with Centrus, Nano warned that the memorandum was "not binding on both parties," that "[t]here [was] no assurance that [Nano] [would] enter into any purchase agreement with Centrus in the future," and that it was possible that its plans to "complete and operate" its fuel fabrication facility could be "delayed, suspended, interrupted, or cancelled." *Id.* at 31. Finally, Nano stated expressly that it "ha[d] not generated any revenue since [its] inception" and that it anticipated that it would "not generate revenue, for the foreseeable future." *Id.* at 17; *see also id.* at 27.

In any event, even if Defendants' statements had not been accompanied by this cautionary language, the PSLRA's safe harbor would apply to most of the statements at issue because, for the reasons discussed above with respect to scienter, Xie fails to allege that Defendants made the statements with actual knowledge that they were false or misleading. First, given that some of the timelines Defendants described stretch five or six years into the future, it would be next to impossible to show that their statements were "both objectively false and disbelieved by [Defendants] at the time [they were] expressed." *In re Allergan PLC Sec. Litig.*, No. 18-CV-12089 (CM)(GWG), 2022 WL 17584155, at *16 (S.D.N.Y. Dec. 12, 2022). Second, the Complaint itself references the ADVANCE Act, which was enacted with the express purpose of "reduc[ing] regulatory costs for companies seeking to license advanced nuclear reactor technologies." SAC ¶ 61. Third, nothing in the Complaint contradicts Defendants' assertions that "there is no regulatory framework in place tailored to microreactors" and that there are

therefore "no 'historic' benchmark[s] for obtaining approvals given that microreactors are a new technology." *Id.* ¶ 119.  And finally, the fact that the confidential witness informed Defendant Yu that the stated timelines were implausible in the then-current regulatory environment does not establish that Defendants knew that they would not be possible in the context of the changed regulatory framework scheduled to be completed in 2027.  *Id.* ¶¶ 57, 61.

## CONCLUSION

For the foregoing reasons, Xie's Section 10(b) and Rule 10b-5 claims fail.  It follows that the Section 20(a) control person claim also fails.  *See, e.g.*, *ATSI Commc'ns*, 493 F.3d at 108. Accordingly, Defendants' motion to dismiss under Rule 12(b)(6) is GRANTED in full.

That raises the question of whether Xie should be permitted to amend her Complaint. Notably, Xie already had one opportunity to amend (following Defendants' initial motion to dismiss), and although she requests leave to amend again, *see* Pl.'s Mem. 27 n.19, she does not identify any facts she would add.  Moreover, there is good reason to doubt that Xie would be able to remedy some of the substantive issues identified above.  That said, mindful that leave to amend a complaint should be freely given "when justice so requires," Fed. R. Civ. P. 15(a)(2), and that "[c]omplaints dismissed under Rule 9(b) are almost always dismissed with leave to amend," *Pasternack v. Shrader*, 863 F.3d 162, 175 (2d Cir. 2017) (internal quotation marks omitted), the Court will grant Xie one final chance to amend.  Xie shall file any Third Amended Complaint within **thirty days of the date of this Opinion and Order**.

The Clerk of Court is directed to terminate ECF No. 60.

SO ORDERED.

Dated: January 8, 2026
New York, New York

_____
JESSE M. FURMAN
United States District Judge